MONMOUTH LUMBER COMPANY, *ETC.*, *ET AL.*, PLAIN-TIFFS-RESPONDENTS, v. INDEMNITY INSURANCE CO. OF NORTH AMERICA, DEFENDANT-APPELLANT.

GEORGE C. KOEPPEL & SON, INC., *ETC.*, PLAINTIFF-RE-SPONDENT, v. DEAL BUILDING SITES, INC., *ET AL.*, DEFENDANTS-APPELLANTS.

IRA LETTS, TRADING AS T. LETTS & SONS, PLAINTIFF-RESPONDENT, v. DEAL BUILDING SITES, INC., *ET AL.*, DEFENDANTS-APPELLANTS.

JOE PETRILLO, *ETC.*, PLAINTIFF-RESPONDENT, v. IN-DEMNITY INSURANCE CO. OF NORTH AMERICA, DE-FENDANT-APPELLANT.

Argued April 16, 1956—Decided May 7, 1956.

440

*Mr. Robert R. Witt* argued the cause for the defendant-appellant Indemnity Insurance Co. of North America (*Mr. Robert V. Carton,* of counsel; *Messrs. Durand, Ivins & Carton,* attorneys).

*Mr. Rocco Ravaschiere* argued the cause for the plaintiffs-respondents Monmouth Lumber Company and Monmouth Concrete Company (*Messrs. Parsons, Labrecque, Canzona & Combs,* attorneys).

*Mr. Sverre Sorenson* argued the cause for plaintiffs-respondents George C. Koeppel & Son, Inc., etc. and Ira Letts, trading as T. Letts & Sons (*Mr. Harry S. Evans* on the brief).

*Mr. Barkave G. Elian* argued the cause for plaintiff-respondent Joe Petrillo, etc.

The opinion of the court was delivered by

VANDERBILT, C. J. This is an appeal by the Indemnity Insurance Company of North America, hereafter referred to as the surety company, from four summary judgments entered against it in the Superior Court, Monmouth County, in favor of the four separate plaintiffs as unpaid laborers and materialmen in a construction project covered by its contractor's bond. These four matters were consolidated for appeal by order of the Appellate Division of the Superior Court to which these appeals were taken. While pending there we certified the matters on our own motion.

Although the facts are somewhat intricate, the principles involved are relatively clear-cut and the facts themselves all but dictate the result.

On May 7, 1953 the defendant surety company executed a contractor's surety bond in the penal sum of $24,147.50 with Deal Construction Corp., the contractor, as principal, and Deal Shore Estates Association, Section II, the owner, and the Trust Company of New Jersey, the lender, as obligees. The following portions of the instrument are germane:

"NOW, THEREFORE, the condition of this obligation is such that, if Principal shall well and truly perform all the undertakings, covenants, terms, conditions and agreements of said Contract on its part, and fully indemnify and save harmless Obligees from all cost and damage which they may suffer by reason of failure so to do, and fully reimburse and repay Obligees all outlay and expense which Obligees may incur in making good any such default, and further, that if Principal shall pay all persons who have contracts directly with Principal for labor or materials furnished pursuant to the provisions of said Contract, failing which such persons shall have a direct right of action against Principal and Surety under this obligation, subject to Obligees' priority, then this obligation shall be null and void; otherwise it shall remain in full force and effect."

"The aggregate liability of Surety hereunder to the Obligees or their assigns is limited to the penal sum above stated, and Surety, upon making any payment hereunder, shall be subrogated to, and shall be entitled to an assignment of, all rights of the payee either against Principal or against any other party liable to the payee in connection with the loss which is the subject of the payment."

The four summary judgments that have been obtained amount to $9,431.33 more than the penal sum of the bond.

The matter is further complicated by the intervening bankruptcy of the Deal Construction Corp., the contractor and principal, and the existence of other creditors who have been secured by this bond.

For the sake of clarity the details of the actions leading to the present summary judgments should be enumerated. The Monmouth Lumber Company brought action against Deal Construction Corp. to recover for materials furnished and delivered to the project in question which went unpaid for, and on June 11, 1954 recovered a default judgment for $3,471.88 and costs. On November 22, 1954, in a similar action against Deal, the Monmouth Concrete Corp. recovered a default judgment in the amount of $627.50 and costs. Subsequently, in March 1955, both Monmouth Lumber Company and Monmouth Concrete Company joined as parties plaintiff in an action against the surety company seeking payment of their judgments from it under the obligation on the bond. In that suit the surety company filed an answer admitting the execution of the bond, denying any independent knowledge as to the facts upon which the original default judgments were recovered and denying that the goods and the materials which formed the basis of those judgments were actually delivered to or incorporated in the construction project covered by the bond. It then demanded answers to certain interrogatories, but before answering the interrogatories these plaintiffs moved for summary judgment. Annexed to the moving papers was detailed proof by affidavit setting forth the material and supplies and a bare assertion that the items were delivered to and used on the job covered by the bond. The answering affidavit furnished by an officer of the surety company indicated that the Monmouth Lumber Company was seeking to recover in part for materials furnished prior to the effective date of the surety bond, that there were no facts set forth in the moving affidavit tending to prove the delivery to and incorporation in the job of the materials and finally that the surety company had no independent knowledge of any of the relevant facts. Summary

judgment was granted covering both claims. The order for judgment was signed June 16, 1955.

In the meantime, other suits had been brought to recover for unpaid labor and materials furnished to the same building project. In two of them, the suits brought by T. Letts & Sons and George C. Koeppel & Son, Inc., the actions were against Deal Construction Corp. and the surety company and others not here material as defendants. The surety answered as it did in the Monmouth case, and submitted interrogatories. This was countered with motions for summary judgments. In these cases, however, evidently becoming concerned because of its actual knowledge of claims in excess of the penal amount of the bond and the probable insolvency of the principal, the surety company made a cross-motion (1) to restrain these plaintiffs from pursuing their motions for summary judgments, (2) for leave to consolidate all these pending actions against these defendants, (3) for leave to file a complaint and order to show cause on all known creditors who had not yet brought suit why they should not be joined and have their claims adjudicated, and (4) for leave to file counterclaims seeking an accounting as to each claim and an adjudication as to each creditor's *pro rata* share of the amount of the bond. The summary judgments were granted without any of the relief sought by the cross-motion. The trial court did, however, indicate that it might grant relief by way of restraining the plaintiffs from executing on their judgments until such time as an appeal had been taken from the summary judgments.

In accordance with the court's suggestion the surety company moved for an order restraining the execution of those judgments already entered and sought a consolidation for trial of the remaining suits that had not yet gone to judgment. On July 8, 1955 an order was entered consolidating seven causes of action for "control and supervision by the Superior Court, Law Division, until such time as this entire matter is finally disposed of." These seven actions included the three in which summary judgments had been obtained and four pending cases. The pending cases were also consoli-

dated for trial purposes and Letts, Koeppel and the Monmouth Companies restrained from taking any proceedings on their judgments beyond levying until the appeals therefrom had been determined.

During this period Joe Petrillo and Sam Rubenstein, trading as P. & R. Contractors, had recovered a default judgment in an action brought against the contractor, Deal Construction Corp. alone, and had thereafter brought action, as did the Monmouth Lumber and Concrete Companies, against the surety company seeking payment of that default judgment. This action was one of the pending cases consolidated for trial. On a similar motion for summary judgment the court granted the judgment but restrained any action thereon beyond the point of levy until the appeal in the Monmouth case had been decided.

The final factual detail was the order entered by the Appellate Division of the Superior Court consolidating the four appeals taken by the surety company from the four summary judgments detailed above.

The issues presented in this matter are: (1) the legal effect on the surety company of the judgments obtained by default in the actions brought against the principal in which the surety was not joined; (2) the propriety in the circumstances here of granting the summary judgments; (3) whether, having knowledge of the fact that the amount of the debts which might be entitled to be satisfied out of the fund is greater than the fund, a *pro rata* distribution should be ordered; and (4) the extent of the liability of the surety company.

(1) Is a default judgment against the principal on a bond in an action where the surety is not made a party conclusive in the action thereafter brought against the surety to recover the amount of the judgment? While there is a difference of opinion among the many jurisdictions in this country, the rule in this State is clearly against binding on a judgment so obtained a surety who has merely undertaken to be responsible for the debts or defaults of the principal and who has not been given the opportunity to defend, *Ball*

*v. Chancellor,* 47 *N. J. L.* 125 (*E. & A.* 1885). It would, of course, be possible for the surety to agree to answer for whatever the results of a suit against a principal might be, and if this is its agreement an unpaid judgment against the principal would be conclusive proof of the liability of the surety—not on any considerations of *res judicata* but purely by the strength of its own agreement freely made, *De Greiff v. Wilson,* 30 *N. J. Eq.* 435 (*Ch.* 1879).

Williston says that the confusion which has resulted appears largely to have been due to a misunderstanding of the civil law where the surety, though not a party, was permitted to defend, 4 *Williston on Contracts* (*rev. ed.*), § 1256, and *McConnell v. Poor,* 113 *Iowa* 133 (*Sup. Ct.* 1901), 84 *N. W.* 968, 969, 52 *L. R. A.* 312, where we are told that:

> "Under the civil law, the surety was permitted to defend, and even allowed to prosecute an appeal from the judgment against the principal, though not a party to the judgment. As he was given his day in court, there appears no serious objection to binding him by the litigation. Much of the confusion in the decisions seems to have resulted from the attempt to apply the rule of the civil law, binding the surety by the litigation against the principal, without allowing the former the participation there accorded."

Though New Jersey is in the minority on this point, we adhere to it as the more reasonable and the more just rule; see also *Restatement, Law of Security,* § 139(3).

The contract under which the surety is bound does not permit of any construction other than that it has merely undertaken to answer for the debt or default of Deal Construction Corp., and not for any judgment that might be obtained against Deal. Further, there appears to be nothing, except possibly in the action by Petrillo, which would lead us to consider that the surety had any notice at all of the pending proceedings against the principal. But even there the creditor ought not to be heard to claim that the surety is bound by the default judgment obtained when by its own action it failed to join the surety in the suit as it could very well have done. Here it was as much the obligation of the creditor where it had knowledge of the bond to join the

surety in the suit against the principal as it was the obligation of the surety when it learned of the pending suit against its principal on an obligation for which it might be held to come in and defend. We are therefore not impressed with the fairness of Petrillo's position.

The default judgments obtained by the Monmouth Companies and Petrillo are not only of little probative significance; in the circumstances of these cases and the rule of this State they are not conclusive against the surety.

(2) In the circumstances of these cases, were summary judgments properly granted? It is fundamental that the purpose of the summary judgment procedure is to grant relief in cases where procedural tactics are interposed to delay the trial and the inevitable result sought by the institution of the suit. It is designed to cut through sham and frivolity in an answer and lay the case before the trial court in its true light. If, when so viewed, there appears to be no genuine triable issue of fact, the relief should be granted. But the burden is upon the moving party to show the clear absence of such genuine issue of fact. Moreover, because of the summary nature of the disposition of the issues of the cases, such relief is to be granted with much caution so as not to defeat a litigant's right to a plenary trial on the merits, *Judson v. People's Bank and Trust Company of Westfield*, 17 *N. J.* 67 (1954).

Here the surety company urges that the plaintiffs in each case have failed to produce or set forth in their affidavits the evidential material necessary to support their claims, particularly so when they are trying to establish a case against a party who has no independent knowledge of the facts. On the other hand, the plaintiffs argue that the surety company, in failing to set forth facts sufficient to support a specific denial of the matters raised by the affidavits in support of the motions, has failed to offer any opposition to the motion and thus there is no genuine triable issue present.

There is something to be said for the argument of each, and therein lies the answer to the problem presented.

Were we to take time to analyze in detail the affidavits of the parties we would find much to require the denial of the motions and little other than conclusory statements of ultimate fact as to delivery to and incorporation in the project and the itemizations to justify such relief. The court must be critical of the moving papers but not those in opposition, *Hoffman v. Partridge,* 84 *U. S. App. D. C.* 224, 172 *F. 2d* 275, 276 (*D. C. Cir.* 1949); see also *Templeton v. Borough of Glen Rock,* 11 *N. J. Super.* 1, 4 (*App. Div.* 1950). This is particularly so when the crucial facts are not within the knowledge of the party making the motion, *Bozant v. Bank of New York,* 156 *F. 2d* 787, 789 (2 *Cir.* 1946). *Cf. Datz v. Barry,* 115 *N. J. Eq.* 84, 87 (*E. & A.* 1934). But even on broader principles the relief here granted should have been denied or at least withheld until discovery proceedings were had by the surety company to enable it, in the absence of being able to verify the alleged indebtednesses from the records of the principal, Deal Construction Corp., to obtain the material necessary to justify any opposition, *R. R.* 4:58–7.

This was the attitude adopted by this court in *Judson v. Peoples Bank and Trust Company of Westfield, supra,* 17 *N. J.* 67, 76 (1954), where Mr. Justice Brennan said:

"Plainly, the rule contemplates that a denial of the motion for summary judgment is not always to be the result. The motion may be held and decided after the opposing party has availed himself of an opportunity to develop through affidavits or depositions material necessary to justify his opposition. This expedient has been adopted even in fraud cases. *Peckham v. Ronrico Corp.,* 7 *F. R. D.* 324 (*D. C. P. R.* 1947), reversed on other grounds 171 *F. 2d* 653 (1 *Cir.* 1948); *cf. Standard Accident Insurance Co. v. Pellecchia,* 27 *N. J. Super.* 189, 195 (*Law Div.* 1953), reversed 15 *N. J.* 162 (1954); see also 51 *Mich. L. Rev., supra, p.* 1170.

Both this court and the Appellate Division, *Templeton v. Borough of Glen Rock, supra,* have been constrained to remark the disproportionate number of reversals of summary judgment made necessary on appeal by the failure to observe the limits of the form and purpose of the procedure. In such cases it is manifest that the ends the procedure is designed to serve are defeated. Time is lost and not saved and expenses are added, not avoided. Commentators upon experience under the federal rule have made kindred observations. *Doehler Metal Furniture Co. v. United States,* 149 *F. 2d* 130, 135 (2 *Cir.* 1945). These undesirable results may be easily avoided, sug-

gests Judge Clark, 36 *Minn. L. Rev., supra,* 579, through recognition that in reaching decision upon a motion for summary judgment '* * * what is needed is the application of common sense, good judgment, and decisive action, on the one hand, not to shut a deserving litigant from his trial and, on the other, not to allow harassment of an equally deserving suitor for immediate relief by a long and worthless trial.'

To which Asbill and Snell, at 51 *Mich. L. Rev., supra,* 1172, add: " 'If these general rules are applied by the courts with discernment and care, the summary judgment procedure, without unjustly depriving a party of a trial, can effectively eliminate from crowded court calendars cases in which a trial would serve no useful purpose and cases in which the threat of a trial is used to coerce a settlement.' "

In its affidavits in opposition the surety company indicated that it had no independent knowledge of the facts and was not able to obtain any. In these circumstances, and assuming the adequacy of the moving papers, it would have been better to conform to the dictates of the *Judson* case, *supra,* and *R. R.* 4:58–7, which provides that:

"Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may deny the motion or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had, or may make such other order as is just."

Compare the dispositions made in *Foster v. General Motors Corp.,* 191 *F. 2d* 907 (*7 Cir.* 1951), and in *United States v. Gotham Pharmacal Corp.,* 1 *F. R. D.* 744 (*D. C. S. D. N. Y.* 1941).

3. Turning now to the equitable aspects of the case, we are asked to close our eyes to the obvious and apply the strictly legal principles of priority among creditors and reward the diligent at the expense of all others—others whose delay in reducing their claims to judgment against the principal may not have been entirely due to neglect or lack of interest, but may have been motivated by a sincere attempt to enable the debtor to rehabilitate himself. This would necessitate our overlooking the fact that the principal is insolvent and presupposing that the creditors not paid might obtain satisfaction elsewhere.

The generally accepted view is that where the creditors are restricted in the satisfaction of their claims to a fund which is insufficient to pay all of them in full, equality of treatment is essential. This is the guiding rule in the settlement of insolvent estates of deceased persons, *N. J. S.* 3*A* :24–37; this is the rule in satisfying the liens of mechanics, materialmen and laborers, *N. J. S.* 2*A* :44–112; this is the rule which must be adopted here.

While it is true that in ordinary circumstances equity follows the law and will not divest rights that have been legally acquired, that doctrine must yield if extraordinary circumstances or "countervailing equities" call for relief, *Camden Trust Co. v. Handle,* 132 *N. J. Eq.* 97, 108 (*E. & A.* 1942). We find that courts of equity have on many occasions applied the principle "Equity is equality" in cases where all creditors who sought payment from a common bond fund were of equal right, *Guffanti v. National Surety Co.,* 196 *N. Y.* 452, 90 *N. E.* 174 (*Ct. App.* 1909). Even where claims have been reduced to judgment, the doctrine of equality of treatment is applied where justice requires it to prevent the unseemly scramble for preferences at the expense of the pursuit of orderly business methods, *American Surety Co. v. Lawrenceville Cement Co.,* 96 *F.* 25 (*C. C.* 1899), *Century Indemnity Co. v. Kofsky,* 115 *Conn.* 193, 161 *A.* 101 (*Sup. Ct. Err.* 1932); see also annotation in 128 *A. L. R.* 1096, and compare the philosophy underlying the rule with respect to contribution among joint tortfeasors in *Judson v. Peoples Bank and Trust Company of Westfield, supra.* Most significantly, Chief Justice Maltbie, in *Century Indemnity Co. v. Kofsky, supra* [115 *Conn.* 193, 161 *A.* 103], pointed out that:

"* * * A rule of priority dependent upon the time when actions are begun against the insured would be likely to lead to a race to begin such actions, with an added burden of litigation to parties and the courts and a tendency to prevent or render more difficult the settlement of claims. A rule of priority made dependent upon the time when judgments were rendered against the insured would often make controlling the adventitious circumstances attend-

ing litigation, often beyond the control or responsibility of the parties. * * *"

"* * * 'Whenever several persons are all entitled to participate in a common fund, or are all creditors of a common debtor, equity will award a distribution of the fund, or a satisfaction of the claims, in accordance with the maxim, Equality is equity; in other words, if the fund is not sufficient to discharge all claims upon it in full, or if the debtor is insolvent, equity will incline to regard all the demands as standing upon equal footing and will decree a pro rata distribution or payment.' 1 *Pomeroy's Equity Jurisprudence* (4th Ed.) § 407. * * *"

As pointed out in *American Surety Co. v. Lawrenceville Cement Co., supra,* 96 F. 25 (C. C. 1899), no hard and fast rule can be adopted for there may be exceptional circumstances where it would indeed be inequitable to apply the doctrine of *pro rata* distribution among the persons interested in the bond fund. But this is not such a case.

4. It is suggested by the surety company that its liability should be limited in the aggregate to the penal sum of the bond. Although it spent considerable time and effort in this regard, the point was not challenged, nor could it very well be. By the express provisions of the bond its liability to the obligees is limited to the penal sum stated. It has long been settled law that a surety is chargeable only according to the strict terms of its undertaking and its obligation cannot and should not be extended either by implication or by construction beyond the confines of its contract. *Skillman v. United States Fidelity & Guaranty Co.,* 101 N. J. L. 511 (E. & A. 1925); *Boorstein v. Miller,* 124 N. J. Eq. 526 (Ch. 1938); cf. *Southern Surety Co. v. Bender,* 41 Ohio App. 541, 180 N. E. 198 (1931).

The summary judgments entered below are accordingly reversed and the cases remanded for disposition according to the dictates of this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, JACOBS and BRENNAN—6.

*For affirmance*—None.