270 N.J. Super. 274 (1994)
637 A.2d 173
MARIE WOLFSON, BOTH INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF INFORMATION SYSTEMS, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
KATHLEEN P. BONELLO AND INVENTORY SYSTEMS, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 9, 1993.
Decided February 3, 1994.
*279 Before Judges BRODY, STERN and KEEFE.
Ivy Paige Urdang argued the cause for appellant, Robert J. Lenrow.
Robert J. Olejar, respondent, filed a brief pro se (Olejar & Olejar, attorneys).
The opinion of the court was delivered by KEEFE, J.A.D.
The appeal requires us to address the authority of a court of equity to establish priorities among judgment creditors where all but one of the judgments resulted from the same litigation against the judgment debtor. In an order dated January 11, 1992, the trial judge directed that a court appointed accountant, Robert J. Olejar, and a court appointed attorney, Robert A. Vort, receive a priority in the distribution of funds resulting from the sale of the judgment debtor's New Jersey real estate, while other judgment creditors would be paid on a pro rata basis in proportion to the amount of their judgments, without regard to the date of entry of their respective judgments or the date of execution. One of the general creditors, Robert J. Lenrow, Esq., appeals from that judgment. For the reasons stated herein, we affirm in part and reverse in part.
*280 Plaintiff Marie Wolfson (Wolfson),[1] both individually and on behalf of Information Systems, Inc. (Information), instituted suit against Kathleen Bonello (Bonello) and Inventory Systems, Inc. (Inventory), a company formed by Bonello and over which she had full control. Wolfson alleged that Bonello diverted business from Information, the company in which they were both principals and sole shareholders, to Inventory.
The general equity judge determined that Wolfson was the owner of 50% of the stock of Information, and that a second trial was necessary to determine the value of that interest in light of the business that had been wrongfully diverted from Information to Inventory. Defendant Inventory was represented in the litigation by Robert J. Lenrow, Esq. (Lenrow), the appellant in this matter, until May 24, 1989, at which time he withdrew as counsel pursuant to R. 1:11-2. Lenrow was then replaced by the firm of respondent Goldberg, Mufson & Spar (Goldberg), who represented Inventory thereafter.[2] Bonello participated pro se after her attorney, Alice Meyer, Esq., withdrew at the same time Lenrow withdrew. To assist the court with its task, Robert J. Olejar, an attorney and certified public accountant, was appointed by the court on October 24, 1989 to provide accounting services.
After fee arbitration was declined,[3] Lenrow instituted suit against Bonello, alleging that Bonello failed to pay Lenrow's counsel fees. On February 2, 1990, a jury returned a verdict in favor of Lenrow and against Bonello. On March 8, 1990, judgment was entered against Bonello for $62,121 in favor of Lenrow. The judgment was filed in Bergen County on March 8, 1990, and was recorded in Trenton on March 28, 1990.
*281 On March 27, 1990, over two years after the case had commenced, and before completion of the second phase, Wolfson, as plaintiff in the case against Bonello, and Goldberg, in an effort to secure legal fees from Bonello, obtained a writ of attachment on all of Bonello's property located in Bergen County. The writ was issued pursuant to an order signed by the general equity judge on March 26, 1990. That order also stated that Wolfson and Bonello would each be responsible for one-half of Olejar's fees as the court appointed accountant.
On April 18, 1990, Lenrow obtained a writ of execution in Bergen County. Bonello's property in Bergen County included an ownership interest in real estate located in Teaneck.
On March 18, 1991, Lenrow filed his judgment in the Supreme Court of New York, apparently because Bonello possessed an ownership interest in a cooperative apartment located in New York City.[4] On April 3, 1991 and June 7, 1991, Lenrow issued executions in New York, which resulted in a levy by the Sheriff of New York upon Bonello's interest in the cooperative apartment.[5]
On March 21, 1991, Lenrow submitted an Order to Show Cause with Temporary Restraints in order to resolve the issue of priority between the executed judgment held by Lenrow and the writ of attachment held by Wolfson and Goldberg which, to that point, had not been reduced to judgment. The Order to Show Cause was not issued and no hearing was granted.
On March 26, 1991, the general equity judge ordered that Bonello's Teaneck property be sold as a means of compelling Bonello to satisfy one-half of Olejar's accounting fees, as she was *282 required to do pursuant to the March 26, 1990 Order.[6] More specifically, the order provided:
[T]his Court is satisfied that a sale of Kathleen Bonello's interest in the Teaneck real property represents the most expeditious and only reasonable method of ensuring reasonably prompt compliance with the orders of this Court directing payments of the fees of its appointed expert, Robert J. Olejar.
Citing the claim of Goldberg for counsel fees, the judgment obtained by Lenrow, and the possible claim of Wolfson relating to the portion of the underlying litigation which had not yet been decided, the order acknowledged that other claims against the assets of Bonello existed, but that
all such additional claims can best be resolved, and the priority and amount thereof determined, following payment of the amounts due to Robert J. Olejar from the proceeds of the sale of the aforesaid Teaneck property, with the said proceeds to be held pending further order of this Court.
The order also appointed Robert A. Vort, Esq. (Vort), a member of the Goldberg firm, as its agent for purposes of selling the Teaneck property. Finally, the order stated:
The proceeds of the sale of the [Teaneck] property shall be applied first to the payment of the expenses of sale, including brokerage commission and closing expenses; next to the payment of any liens pre-dating the issuance of this order and thereafter to the payment of the aforesaid fees of Robert J. Olejar. The remaining proceeds of sale shall be held by [Vort], to be paid and disbursed as directed by the Court....
By order dated July 8, 1991, the general equity judge appointed Lenrow's attorney, Ivy Paige Urdang (Urdang), to have the New York cooperative apartment appraised and listed for sale. The sale would include the stock held by Bonello in the cooperative association and the proprietary lease to that apartment. The order stated that the proceeds of any sale of the apartment should be held by Urdang, then distributed in accordance with directions given by the court. The order also stated that if no contract was made for sale of the apartment within 90 days of its listing, then a sale by the Sheriff of New York could proceed in accordance with *283 New York law. The order further stated that the proceeds of any sale should be applied as follows: 1) to expenses of sale, 2) to the fees of Urdang associated with the sale of the property, 3) to payment of the appraiser, and 4) "[t]o the payment of any liens on the property in accordance with their priorities under the law of the State of New York where the property is located[.]"[7] The judge further ordered that any remaining proceeds of the sale be held by Urdang and that those proceeds would be distributed as directed by the court.
On July 18, 1991, the judge entered judgment in favor of Wolfson and against Bonello in the amount of $302,966. Moreover, a separate supplemental judgment was entered in favor of Wolfson and against Bonello for $136,539, which represented reimbursement from Bonello to Wolfson for two-thirds of Wolfson's attorney fees and costs. The court also entered a supplemental judgment in favor of Goldberg and against Bonello for attorney fees and costs totalling $53,765. The record does not contain any notification to Bonello of her right to fee arbitration, or a complaint by Goldberg against Bonello in support of the counsel fee award. See R. 1:20A-6.
Next, judgment was entered in favor of Olejar and against Bonello. The court ordered that Bonello pay the sum of $15,764, which represented one-half of Olejar's total costs, and also determined that Bonello should reimburse Wolfson for any amounts paid by Wolfson to Olejar above 20% of Olejar's total fees.[8] The *284 amount of this additional reimbursement was $9,459, and its payment from Bonello to Wolfson was ordered on August 2, 1991.
On September 4, 1991, a writ of execution was issued on Wolfson's judgment, and this writ was received by the Bergen County Sheriff's office on September 23, 1991. There is nothing in the record indicating that either Olejar or Goldberg have executed on their judgments.
On December 11, 1992, the general equity judge issued a decision regarding the distribution of the proceeds derived from the sale of the Teaneck residence, including the priorities of each party regarding that distribution.[9] The court initially determined that Vort and Olejar should be paid first, noting that those two parties
stand on a different footing from those of the other judgment creditors. Each represents services performed pursuant to the request and direction of the court. Each played a substantial part in producing the fund presently on hand and available for distribution.
After stating that the equitable treatment of all claims required that any payment of pre- or post-judgment interest be eliminated, the judge determined that the amount paid to Olejar should be $10,000. While he recognized that the judgment entered on July 18, 1991 called for a larger payment to Olejar, he decided that a reduction had to be made "because of the impossibility of paying all creditors the full amount to which they should be entitled."
Next, the court determined that Vort was entitled to payment of $6,000 for his part in the sale of the Teaneck residence. Moreover, the court determined that the bills submitted by Vort for services in connection with the maintenance and sale of the Teaneck home were appropriate and should be paid before any payment to other judgment creditors was made.
*285 The judge next turned to the issue of priority regarding the remaining judgment creditors: Lenrow, Goldberg, Wolfson and Clarence Lofberg, Inc.[10] The judge determined that those creditors would each be paid on a pro rata basis in proportion to the amounts of their respective judgments, and without regard to the date of entry.
The judge explained that this approach would
treat all of these judgments, essentially, as though this were a proceeding in bankruptcy or a proceeding to liquidate an insolvent debtor. In fact, that is, in substance, what we have here.
The judge stated that fixing priority amongst these creditors on the basis of when their respective judgments were entered or by what date "a particular action was or as [sic] not take [sic] by a judgment creditor" would yield irrational and unjust results. He further observed that fixing priority on that basis "would cause payments to be made or withheld because of the serendipitous timing which led one judgment to be entered prior to or later than another."
The judge concluded his opinion by ruling that any funds which became available subsequent to his decision, i.e., funds derived from any future sale of the New York cooperative apartment  would be distributed in the same pro rata manner. The judge cited no statutory or case law to support his decision.
On January 11, 1993, an order was signed memorializing the written opinion of December 11, 1992. The order also relieved Urdang of her duties as agent of the court to sell the New York *286 cooperative apartment. That portion of the January 11th order directing pro rata payments to Wolfson, Lenrow, Goldberg and Lofberg, was stayed pending appeal, as was any payment to Olejar beyond $8,000.
On appeal, Lenrow disputes the priority structure set forth in the January 11th order. He asserts that the priority structure for competing judgment creditors is erroneous because it fixes priority on a pro rata basis in accordance with the amount of judgments, rather than on when judgments were entered or executed upon. Lenrow also challenges the grant of a priority to Goldberg's judgment for counsel fees, arguing that Goldberg's judgment is void or voidable. Moreover, Lenrow argues that Olejar's August 8, 1991 judgment should not have priority over his judgment, which was acquired and executed upon in 1990. Finally, Lenrow challenges the trial court's jurisdiction over any future proceeds derived from the sale of the New York cooperative apartment, and argues that he has a lien over that property under New York law.

I
As to the distribution of the proceeds on a strictly equitable basis, it is well settled that equity follows the law. Dunkin' Donuts of America v. Middletown Donut Corp., 100 N.J. 166, 183, 495 A.2d 66 (1985). See Hadden v. Eli Lilly and Co., 208 N.J. Super. 716, 721, 506 A.2d 844 (App.Div.), certif. denied, 104 N.J. 441, 517 A.2d 431 (1986) ("[W]hile equitable principles may, in the interests of justice, be applied to expand statutory rights, they may not be applied to contract or otherwise constrict those rights."). In this case, the trial judge went beyond his authority in distributing the proceeds of sale among judgment creditors based on wholly equitable grounds in view of the already existing statutory and case law governing the subject.
Regarding priority between judgment creditors, the New Jersey Supreme Court in New Brunswick Sav. Bank v. Markouski, 123 N.J. 402, 587 A.2d 1265 (1991), noted that, pursuant to N.J.S.A. 2A:17-39, the creditor who levies first under a writ of execution *287 has priority over all other judgment creditors. Id. at 413, 587 A.2d 1265. See Pulaski Sav. and Loan Ass'n v. Aguiar, 174 N.J. Super. 42, 49, 415 A.2d 365 (Ch.Div. 1980) ("[N.J.S.A. 2A:17-39] grants to a levying judgment creditor a super-priority over senior nonlevying judgment creditors."); Burg v. Edmondson, 111 N.J. Super. 82, 85, 267 A.2d 545 (Ch.Div. 1970) ("[N.J.S.A. 2A:17-39] gives a judgment junior in time priority of lien over a senior judgment by first levying upon the land under an execution issued on the judgment.").
Thus, a junior judgment creditor who levies has priority over a senior judgment creditor that has not levied. Ibid. Moreover, if two or more judgment creditors both obtain writs of execution, priority is determined by the date and time of delivery to the sheriff. N.J.S.A. 2A:17-13.
Our research has revealed only one instance where it was deemed proper for creditors to share on a pro rata basis from a common fund to satisfy their debts where the debtor had declared bankruptcy, and the surety bond provided a fixed fund for those it was intended to benefit. Monmouth Lumber Co. v. Indemnity Ins. Co., 21 N.J. 439, 451-52, 122 A.2d 604 (1956). However, the Court cautioned that "no hard and fast rule can be adopted for there may be exceptional circumstances where it would indeed be inequitable to apply the doctrine on a pro rata basis." Id. at 452, 122 A.2d 604. However, the facts of this case are considerably different from the facts of Monmouth Lumber: there is no proof that Bonello is bankrupt, and her creditors are not members of a common class claiming a share in a fund created solely for their benefit. Indeed, we perceive no inequity here simply because Lenrow is an attorney who, by happenstance, had his claim adjudicated in the Law Division before plaintiff Wolfson received a final adjudication in the Chancery Division. There is no evidence here that Lenrow manipulated the system or otherwise acted in bad faith so as to deprive him of the benefit conferred by N.J.S.A. 2A:17-39. Thus, it would be contrary to law under these circumstances to divide a debtor's assets on a pro rata basis according to *288 the size of the judgments held against the debtor when one of the judgment creditors has levied on the property pursuant to a writ of execution. See Hon. William A. Dreier, Guidebook to Chancery Practice in New Jersey at 8 (After discussing Monmouth Lumber, Judge Dreier notes that, when there is a levying judgment creditor, N.J.S.A. 2A:17-39 grants that judgment a priority, "and in such an instance, `equity will follow the law.'"). The trial judge's decision to distribute funds on a pro rata basis without regard to N.J.S.A. 2A:17-39 or applicable case law simply does not "follow the law."
While the foregoing discussion resolves the issue of priority as between judgment creditors, it does not resolve the issue of priority as between a judgment creditor who has levied via a writ of execution and a judgment creditor who, prior to obtaining judgment, has obtained a writ of attachment. Lenrow argues that his judgment, which was entered and filed in Bergen County on March 8, 1990, docketed in Trenton on March 26, 1990, and executed upon on April 18, 1990, should be afforded priority over the later judgments of both Wolfson and Goldberg because the earlier writ of attachment obtained by Wolfson and Goldberg was invalidly issued.
While there is no New Jersey case law directly on point, the exact issue was addressed by Judge Stripp of the United States Bankruptcy Court in In re Bobilin, 83 B.R. 258 (Bankr.D.N.J. 1988). Noting the dearth of State court case law directly on point, Judge Stripp turned to the case of J.T. Evans Co. v. Fanelli, 59 N.J. Super. 19, 157 A.2d 36 (Law Div. 1959), which discussed how a mechanics lien, as opposed to a writ of attachment, would effect priority between such lien-holder and another judgment creditor who had levied.
In J.T. Evans Co., the plaintiff filed a mechanic's lien against certain property. Id. at 21, 157 A.2d 36. Subsequent to acquiring the lien, plaintiff obtained a judgment. Id. at 21-22, 157 A.2d 36. After the judgment was obtained, the defendants in the case obtained a judgment against the same parties who owned the *289 property that plaintiff had obtained the mechanic's lien against. Id. at 22, 157 A.2d 36. The defendants then obtained a writ of execution and had the sheriff levy against the property. Ibid. The plaintiff had not obtained a writ of execution on its mechanic's lien judgment before the defendants had executed upon their judgment. Ibid.
The court decided that plaintiff had priority over the proceeds of the sale of the property. Id. at 25-26, 157 A.2d 36. It held:
[A]lthough by the judgment the original cause of action is extinguished and a new cause of action is created, advantages to which the plaintiff was entitled with respect to the original cause of action may not be destroyed by the judgment. Thus, if a creditor has a lien upon the property of the debtor and obtains a judgment against him, he does not thereby lose the benefit of the lien.... The court determines that an execution on plaintiff's judgment after defendant's sale relates back over defendant's rights.

[Id. at 26, 157 A.2d 36 (emphasis added).]
Applying that rationale to a case involving a writ of attachment, Judge Stripp, in Bobilin, reasoned:
The law applicable in this case requires a similar result. Under N.J.S.A. 2A:17-13, priority as between writs of execution on general judgments is determined by date and time of delivery to the sheriff. However, a sale under a writ of execution in an attachment action relates back to the issuance of the writ of attachment[.] ... Thus a writ of execution on a judgment in an attachment action takes priority over an earlier writ of execution issued on a general judgment, if the writ of attachment was issued before the entry of the general judgment. A judgment in an attachment action is therefore a statutory exception to the general rule in N.J.S.A. 2A:17-39 that a junior judgment creditor who executes takes priority over holders of senior judgments who have not yet executed.
[Bobilin, supra, 83 B.R. at 263 (emphasis in original).]
Because attachment is an "extraordinary remedy in rem for the collection of an ordinary debt by seizure of the property of the debtor," Russell v. Fred G. Pohl Co., 7 N.J. 32, 39, 80 A.2d 191 (1951), and may only be issued where plaintiff exhibits that there is a probability of success on the merits and satisfies enumerated statutory criteria, we hold that the priority given such writs in Bobilin is a correct statement of New Jersey law. See, R. 4:60-5(a).
*290 We now turn to the issue of the validity of the writ of attachment issued to Wolfson and Goldberg in this case.[11] The attachment statute, N.J.S.A. 2A:26-1 et seq., is the sole source of the attachment remedy. Tanner Associates, Inc. v. Ciraldo, 33 N.J. 51, 53, 161 A.2d 725 (1960). Moreover, the statute and court rules regarding attachment must be strictly construed. Lundy v. Collitti, 155 N.J. Super. 34, 39, 382 A.2d 94 (Law Div. 1977).
The statutory grounds for a obtaining a writ of attachment are set forth in N.J.S.A. 2A:26-2:
An attachment may issue ... against the property, real and personal, of any defendant in any one of the following instances:
a. Where the facts would entitle plaintiff to an order of arrest before judgment in a civil action[.]...
b. Where the defendant absconds or is a nonresident of this state, and a summons cannot be served on him in this state[.] ...
c. Where the cause of action existed against a decedent, which survives against his heirs, devisees, executors, administrators or trustees, and there is property in this state which by law is subject to plaintiff's claim[.] ...
d. Where the plaintiff has a claim of an equitable nature as to which a money judgment is demanded against the defendant, and the defendant absconds or is a nonresident and a summons cannot be served upon him in this state[.] ...
e. Where the defendant is a corporation created by the laws of another state but authorized to do business in this state and such other state authorizes attachments against New Jersey corporations authorized to do business in the state.
In this case, none of the statutory grounds for obtaining a writ of attachment were met. Specifically, it is important to note that the underlying case of Wolfson v. Bonello was initiated by a Verified Complaint and Order to Show Cause in 1987. The writ of attachment was not issued until March 27, 1990. Therefore, the writ was not used as initial process to compel defendant Bonello to *291 appear in court. Bonello filed an answer and appeared in court. Thus, N.J.S.A. 2A:26-2b and 2A:26-2d criteria are not met. Moreover, N.J.S.A. 2A:26-2c and 2A:26-2e are not applicable under the circumstances of this case.
That leaves N.J.S.A. 2A:26-2a as the only possible statutory basis on which the writ of attachment could be justified. N.J.S.A. 2A:26-2a requires Wolfson and/or Goldberg to prove that they were entitled to an order of arrest before judgment. The grounds on which Wolfson brought her original claim sound in tort. N.J.S.A. 2A:15-41 provides that a capias ad respondendum will be issued for the arrest of a defendant in a tort action only if the cause of action is founded upon
a) an outrageous battery or mayhem, b) a claim of damages for the misconduct or neglect of a public officer or c) a wilful or malicious act and the defendant is a nonresident or is about to remove from the state. In such a case the court shall hold the defendant to bail, in an amount which it thinks proper under the circumstances.

[N.J.S.A. 2A:15-41.]
It is clear in this case that the causes of action alleged by Wolfson in her complaint do not fulfill the requirements of N.J.S.A. 2A:15-41; as such, N.J.S.A. 2A:26-2a can not be utilized as a statutory basis of attachment in this matter.[12] Therefore, the writ of attachment issued to Wolfson was invalid.
Goldberg's claim for counsel fees also did not warrant the issuance of the writ for essentially the same reasons. Moreover, the record does not reveal that Goldberg ever filed a complaint against Bonello, a step that R. 4:60-2 requires.
*292 Lenrow also argues that the judgment issued to Goldberg is invalid because Goldberg did not follow the procedures set forth in R. 1:20A-6, Pre-Action Notice to Client. See Rosenfeld v. Rosenfeld, 239 N.J. Super. 77, 79-80, 570 A.2d 1026 (Ch.Div. 1989) (applying R. 1:20A-6 to dismiss attorney's petition for fees). We need not reach that issue because Lenrow is entitled to a priority over Goldberg simply by invalidation of the writ.

II
Lenrow maintains that he was inappropriately restrained from proceeding with a Sheriff's sale of the New York apartment. More specifically, his appellate brief states the following:
The Court directed a private sale of [the apartment], in the hopes that a private sale would generate a larger return. Although the property was listed with in excess of twenty New York brokers, no offers were received. Ultimately, ... Urdang was discharged as agent to sell [the apartment]. While no further restraints were issued on the sale by the New York Sheriff under the levy obtained by Lenrow, the order barring Lenrow from proceeding with a Sheriff's sale was not vacated.

Our review of the record does not reveal any order which specifically bars Lenrow from proceeding with the execution sale of the New York property.
In any event, in a letter to the trial judge dated December 23, 1992 (12 days after the decision regarding priority of payments), Lenrow's counsel states: "[t]he cooperative apartment has been listed using an open listing with numerous realtors in New York for one year. There have been no offers...." The judge's order, however, states that if no contract for sale of the apartment is made within 90 days of the listing agreement, then the sale by the Sheriff should proceed in accordance with New York law. Clearly, this order does not support Lenrow's argument.
Lenrow also argues that the trial judge erred by deciding that any proceeds derived from the sale of the New York cooperative apartment should be distributed on a pro rata basis in accordance with the amount of each judgment creditor's respective judgment. Lenrow posits that regardless of how the proceeds are *293 obtained (i.e., through a private sale or a sheriff's sale), he should have first priority over those proceeds because he is the only one to file and execute upon his judgment in the State of New York. In his July 8, 1991 Order, the trial judge instructed that, after expenses, any proceeds remaining from the sale of the New York property should be applied "[t]o the payment of any liens on the property in accordance with their priorities under the law of the State of New York where the property is located." On May 15, 1992, he amended that order, stating that the any proceeds would be distributed by the court after expenses and liens other than the liens of Wolfson, Lenrow, Goldberg and Lofberg.
Olejar contended at oral argument that Bonello's interest in the cooperative apartment in New York is personalty rather than realty, because it is represented by issued shares of stock, and, as such, the trial court had jurisdiction over Bonello's personalty located in New Jersey. We reject Olejar's argument for several reasons: First, Olejar cites no authority for the proposition that an interest in a cooperative apartment is personalty. (However, we note that New York considers such ownership interest to be personal property. State Tax Commission v. Shor, 43 N.Y.2d 151, 400 N.Y.S.2d 805, 371 N.E.2d 523 (1977)). Second, even if it is personalty, there is no proof in the record that the stock was in New Jersey. Indeed, the record appears to indicate that 131 West Owners Corp. is in possession of Bonello's stock. Third, Olejar never questioned the authority of the Sheriff of New York to sell Bonello's interest in the apartment at an execution sale. Thus, we conclude that the trial court lacked authority to dispose of that property under its order of distribution.
Lenrow is the only judgment creditor to execute and file in New York. In New York, judgment creditors are entitled to a preference in the order in which their judgments are docketed. Valley Nat'l Bank of Long Island v. Levy, 45 A.D.2d 771, 356 N.Y.S.2d 1003 (1974). See also, N.Y.Civ.Prac.L. & R. § 5203, Practice Commentary C5203:2 ("The money judgment becomes a lien on the judgment debtor's real property, and secures a priority *294 for the judgment creditor, when the judgment is `docketed' with the county clerk of the county where the real property is located."). Because Lenrow is the only judgment creditor with a lien on this New York property, we hold that he has a priority over any proceeds derived from the sale of that property, at least with respect to the parties involved in this litigation.

III
Lenrow next argues that the trial judge erred by according the payment of Olejar's accounting fees priority over Lenrow's judgment. Lenrow asserts that his judgment, which was entered and filed in Bergen County on March 8, 1990, docketed in Trenton on March 26, 1990, and executed upon on April 18, 1990, must take priority over Olejar's judgment, which was entered on July 18, 1991, and has never been executed upon. Lenrow maintains that any services provided by Olejar were performed after Lenrow's representation in the case had ended, and, therefore, that he did not reap any benefit from those services. Lenrow argues that his judgment against Bonello had nothing to do with the underlying case of Wolfson v. Bonello for which Olejar's services were required, but instead was based on a contract for legal services between he and Bonello which had terminated before Olejar ever became involved in the case. Finally, Lenrow asserts that Olejar's claim for fees was not ripe at the time Lenrow's judgment was entered, filed, docketed and executed upon in March and April 1990, because Olejar's work in the case had not yet been completed. Lenrow fails to cite case law, except that which is applicable to the Wolfson judgment, to support any of his position.
In response, Olejar argues that he, as a court-appointed accounting expert, is entitled to priority over judgment creditors regardless of when those creditors entered, docketed or executed upon their judgments. He also contends that Lenrow's position with respect to his fees is inconsistent with Lenrow's position on Vort's fees. Lenrow has not challenged the priority given to Vort, yet Vort was also appointed by the court to perform a service. *295 Furthermore, Vort's services were performed after Lenrow levied on the property. Indeed, the record reveals that Vort was directed to sell the property primarily for the purpose of paying Olejar's fee.
The power to appoint an accountant and award fees against any party to the action is well within the broad discretion of the Chancery judge. Anzalone v. Anzalone Bros., Inc., 185 N.J. Super. 481, 489, 449 A.2d 1310 (App.Div. 1982). See Fellerman v. Bradley, 191 N.J. Super. 73, 77-78, 465 A.2d 558 (Ch.Div.), aff'd, 192 N.J. Super. 556, 471 A.2d 788 (App.Div. 1983), aff'd, 99 N.J. 493, 493 A.2d 1239 (1985) (noting that court-appointed accounting expert "was to function as an arm of [the] court, accountable not to counsel, but directly to the court"). In this case, Olejar was appointed by the trial judge in order to resolve complex financial matters which were key to the resolution of the case. The trial judge specifically found that:
[t]he analysis [Olejar] performed was of substantial value in enabling the court, as well as counsel, to finally bring an end to this most difficult litigation.
Lenrow's failure to object to the priority given Vort in these circumstances is itself an acknowledgement of the court's inherent right to appoint an expert to aid the court in resolving issues before it and provide for the expert's compensation. See Bowen v. Bowen, 96 N.J. 36, 52, 473 A.2d 73 (1984); New Jersey Div. of Youth and Family Services v. E.B., 264 N.J. Super. 1, 8-9, 623 A.2d 1379 (App.Div. 1993); Southern Burlington County, N.A.A.C.P. v. Mount Laurel Township., 92 N.J. 158, 293, 456 A.2d 390 (1983). It is also within the trial judge's discretion, as a part of the court's inherent power, to afford priority to Olejar. Such protection is necessary because a court-appointed expert is unable to insure payment in the same manner that is available to creditors, such as Lenrow. Whereas Lenrow could have required Bonello to pay a retainer, insist on a security interest on the Teaneck residence, or withdrawn before the amount of the unpaid fees became too large, such options are unavailable to a court-appointed expert. More importantly, however, if court-appointed *296 experts are not given priority, it will become increasingly difficult for courts to find capable experts who are willing to perform duties that are beneficial to the litigants, yet in many cases, quite onerous.
Based on the foregoing, we affirm the decision to grant priority to Olejar over other judgment creditors, including Lenrow.
The judgment under review is reversed in part and affirmed in part. The matter is remanded for the entry of judgment consistent with this opinion.
NOTES
[1] Wolfson is not participating in this appeal.
[2] Goldberg failed to file a brief in the matter.
[3] Lenrow's appellate counsel represented at oral argument that R. 1:20A-6 had been complied with prior to the institution of suit.
[4] Bonello's interest in the cooperative apartment was represented by shares of stock in 131 West Owners Corp. The trial judge had ordered the stock turned over to Olejar but Bonello testified that the stock was lost or destroyed. Thus, Lenrow levied upon the proprietary lease and the stock to the extent that new shares would have to be issued by 131 West Owners Corp. in New York.
[5] The record does not indicate that any of the creditors (who will be discussed infra), other than Lenrow, have filed their judgments in New York.
[6] The amount owed by Bonello at this time was $12,987. The text of the order indicates that prior attempts to compel Bonello to pay her share of Olejar's fees were fruitless.
[7] This Order was amended by an Order dated May 15, 1992, which states: "[T]he Order of July 8, 1991 ... is hereby amended to specifically state that the proceeds of the sale of the Bonello shares and proprietary lease for [the New York apartment], after the payment of expenses and liens other than liens of Marie Wolfson, Robert Lenrow, Goldberg, Mufson & Spar, and Carl Lofberg as set forth in the aforesaid order, are to be held in trust by Ms. Urdang until distribution in accordance with further order of this Court. This direction is applicable whether [Urdang] sells the property privately, or through the office of the Sheriff of New York [.] ... (emphasis added)" For a discussion of Lofberg's interest in this case, see footnote 10.
[8] Thus, in effect, Bonello was ordered to pick up 80% of Olejar's total fees.
[9] This decision was rendered, and the January 11, 1993 order memorializing it was entered, as a result of a Notice of Motion for instructions regarding disbursement of the net proceeds of the Teaneck residence made by Vort.
[10] Evidently, Lofberg is a judgment creditor who obtained two judgments against Bonello: one on June 9, 1988, which was satisfied out of funds placed in escrow during the litigation between Lofberg and Bonello; the other on May 24, 1991, which remains unsatisfied. While we can ascertain from the trial court's December 11, 1992 decision that Lofberg is a judgment creditor, and that the amount owed to Lofberg is $40,142, no other information pertaining to Lofberg's judgment, such as whether Lofberg executed upon it, is available, as the record is devoid of any such information, and Lofberg has not filed a brief in this matter. Indeed, the judgment dates noted above were obtained from appellant's brief, and are not supported by any other information in the record.
[11] We assume for the purpose of discussion that the writ was issued before Lenrow's judgment was recorded. However, the docketing of Lenrow's judgment in Bergen County on March 8, 1990 may have been sufficient to obtain priority over a valid writ of attachment issued subsequent to that date, at least as to Bonello's Bergen County real estate. See, Brescher v. Gern, Dunetz, Davison & Weinstein, P.C., 245 N.J. Super. 365, 373, 585 A.2d 961 (App.Div. 1991) ("Recording of documents is largely statutory under the recording acts and may give notice in the county, but not beyond, without statutory authorization.").
[12] The alleged torts committed by Bonello included breach of the duty of loyalty, breach of fiduciary duty, waste of corporate assets, misappropriation of corporate opportunity and conversion. The alleged torts committed by Inventory included interference with contractual relations and unfair competition. Moreover, plaintiff claims that both Bonello and Inventory were unjustly enriched to plaintiffs' detriment.