280 N.J. Super. 430 (1995)
655 A.2d 939
EAGLE FIRE PROTECTION CORP., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, CROSS-APPELLANT,
v.
FIRST INDEMNITY OF AMERICA INSURANCE COMPANY, DEFENDANT-APPELLANT, CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted September 20, 1994.
Decided March 28, 1995.
*432 Before Judges MICHELS, STERN and KEEFE.
Joseph C. Glavin, Jr., attorney for appellant and cross-respondent First Indemnity of America Insurance Company.
Furman & Jennings, attorneys for respondent and cross-appellant Eagle Fire Protection Corp. (Vincent J. Jennings, of counsel and Mr. Jennings and Gerald J. Massell, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Defendant First Indemnity of America Insurance Company appeals from a judgment of the Law Division entered on a molded jury verdict that awarded plaintiff Eagle Fire Protection Corp. damages and interest in the total sum of $69,163.61, under a labor and material payment bond.
On May 8, 1989, 185 Monmouth Parkway Associates (Parkway) entered into a contract with Olsen & Hassold, Inc. (Olsen), a general contractor, to remove asbestos and renovate a building located at 185 Monmouth Parkway, West Long Branch, New Jersey. As a condition of the contract, Olsen was required to furnish a surety bond guaranteeing its performance as well as ensuring payment to its subcontractors. Paragraph 22 of the contract, in pertinent part, provided:
PERFORMANCE BOND:
Contractor hereby agrees to furnish for the benefit of Company a Performance Bond in the amount of $1,750,000.00, to cover the faithful performance of all obligations of Contractor and completion of all Work under this Agreement. The cost of obtaining this Bond shall be borne by the Contractor, and the Bond shall remain in full force and effect until all Work under this Agreement has been *433 completed and Company acknowledges in writing that no further Orders shall be submitted to Contractor pursuant to this Agreement. The entity which shall issue this Performance Bond is the First Indemnity of America Insurance Company ...
Defendant executed bonds covering the three construction stages of the project on May 10, 1989. The bond which covered the subcontractors' work was titled "Labor and Material Payment Bond." This bond contained a provision that any suit by an unpaid subcontractor had to be filed within one year of the date that the general contractor ceased work on the contract. The bond, in pertinent part, provided:
Principal [Olsen] has by written agreement dated May 8, 1989, entered into a contract with Owner [Parkway] for re-insulate structure & install sprinkler systems, install ceiling lights and duct work at 185 Monmouth Parkway, West Long Branch, N.J.... which contract is by reference made a part hereof ...
3. No suit or action shall be commenced hereunder by any claimant:
... (b) After the expiration of one (1) year following the date on which Principal ceased Work on said Contract, it being understood, however, that if any limitation embodied in this bond is prohibited by any law controlling the construction hereof such limitation shall be deemed to be amended so as to be equal to the minimum period permitted by such law.
On September 12, 1989, Olsen issued a purchase order for $129,437.50 to plaintiff to install a sprinkler system required under phase two of the project. Although plaintiff fully performed the work of installing the sprinkler system, Olsen allegedly made progress payments of $66,023.50 on the total amount due, leaving an unpaid balance of $63,414. The last such payment was made on May 4, 1990.
Payments made by Parkway's agent to Olsen for work done by the subcontractors were not being remitted to the subcontractors in a timely manner. As a result, Parkway's agent terminated Parkway's contract with Olsen by written notice on September 11, 1990. The termination letter to Olsen in part, read:
Further, we were bonded by the First Indemnity of America Insurance Company and numerous attempts have been made during the past three months to schedule a meeting with the First Indemnity of America Insurance Company to obtain payment for these invoices under the bond. We have now advised each of the suppliers who have notified us of non-payment, of the bonding company's name and contact person.
*434 Jerry J. Massell, plaintiff's attorney, by letter dated September 18, 1990, notified defendant of the default, and demanded payment and threatened to file suit within 20 days if a settlement was not forthcoming. Defendant responded by letter dated September 26, 1990, requesting that plaintiff return an enclosed proof of loss claim form in order to process the claim. Two months later, on November 30, 1990, plaintiff returned the proof of loss claim form to defendant's claim manager, Paul Alongi, and in December 1990, Alongi selected Frank Galdieri, an outside adjuster, to investigate the claim.
On December 7, 1990, Galdieri called Massell and discussed what payments had been made by Olsen to plaintiff and what was the remaining balance. Plaintiff's attorney spoke with Galdieri again on December 10, 1990 also concerning the payments that had been made and the balance owed. Galdieri told Massell that he was reviewing the records of Olsen and was waiting for canceled checks and other written proof. Galdieri informed Massell that if he felt there was a "stall job" he should file suit. That same day, plaintiff sent a letter to Galdieri putting in writing their past discussion concerning payments made and monies still owed. The letter also stated that Massell would check with plaintiff on some past payments and would refrain from suing for the present time. On January 29, 1991, Galdieri again informed Massell that his inability to verify the claim was holding up payment. On February 4, 1991, Galdieri informed Massell of the same problem. The parties last conversation occurred on February 8, 1991.
On May 23, 1991, plaintiff instituted this action against defendant to recover the unpaid balance due under the latter's bond. Defendant denied that it was under any liability to plaintiff, and, by way of separate defense, claimed that plaintiff failed to comply with the terms of the bond that required it to institute suit within one year of Olsen's completion of work. Plaintiff argued that its suit was timely instituted and, that even if it was not, its failure to do so was because of defendant's conduct during negotiations. Plaintiff claimed that the negotiations and discussions with defendant *435 misled it to not institute suit and, therefore, the contractual limitations period should be tolled.
At trial, Massell admitted that the bond required the filing of a suit within one-year from the date that Olsen ceased work at the site. However, according to Massell, the reason he did not file this action earlier was that he and Galdieri were negotiating. Massell acknowledged, however, that Galdieri never told him not to file suit. Galdieri testified that the parties had engaged in several conversations during which Galdieri told Massell that he was having problems verifying the claim. Galdieri testified that he wrote letters to Mr. Olsen in an effort to get his cooperation and was finally able to meet with him about the claim a month later. He also stated that Mr. Massell had promised to provide him with information verifying the claim, but that he never did. Alongi testified that it was defendant's policy to investigate a claim upon the receipt of a proof of claim and that if upon investigation it was determined to be valid, it would be paid. Both Galdieri and Alongi testified that neither told Massell not to file suit.
At the conclusion of the proofs, the trial court submitted special interrogatories to the jury. The jury found that Olsen ceased work on the project before May 23, 1990; that the negotiations, conversations and communications between plaintiff and defendant resulted in plaintiff being caused to delay the filing of suit until May 23, 1991; and that plaintiff sustained damages in the sum of $63,414  the unpaid balance due under the contract. This appeal followed.
Defendant seeks a reversal of the judgment and the entry of a judgment in its favor dismissing the action with prejudice. It contends essentially that the trial court erred in not granting its motion for an involuntary dismissal at the conclusion of the proofs because there was no evidence from which a jury could reasonably find that plaintiff instituted suit within one year of the general contractor ceasing work and there was no evidence that plaintiff was lulled into not instituting suit by any negligent or affirmative action on its part, thus, tolling the bond's one-year limitation *436 period for instituting suit. Alternatively, defendant seeks a reversal of the judgment and a remand for a new trial, contending that the trial court's charge to the jury concerning the failure to file suit within the bond's one-year limitation was erroneous and misleading.
The labor and material payment bond provides that any action by an unpaid subcontractor must be commenced within one year of the date the principal ceased work on the contract in order for the surety to be liable. The bond, in pertinent part provides:
3. No suit or action shall be commenced hereunder by any claimant:

(b) After the expiration of one (1) year following the date on which Principal ceased Work on said Contract, it being understood, however, that if any limitation embodied in this bond is prohibited by any law controlling the construction hereof such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law. [(emphasis added).]
Our courts have held one-year limitation periods in surety bonds valid and enforceable. Ribeira & Lourenco v. Jackson Health, 231 N.J. Super. 16, 22, 554 A.2d 1350 (App.Div. 1989), aff'd, 118 N.J. 419, 571 A.2d 1311 (1990); V. Petrillo & Son, Inc. v. American Const. Co., 148 N.J. Super. 1, 371 A.2d 799 (App.Div.), certif. denied, 75 N.J. 4, 379 A.2d 235 (1977); John M. Kelly Contracting Co. v. U.S. Fidelity & Guaranty Co., 278 F. 345 (3d Cir.1922). Similar provisions have been held valid even when the claimant has no knowledge of the one-year limitation period. Ribeira, supra, 231 N.J. Super. at 22, 554 A.2d 1350. See also Rumsey Elec. Co. v. University of Delaware, 358 A.2d 712 (Del. 1976); Sanders v. American Cas. Co., 269 Cal. App.2d 306, 74 Cal. Rptr. 634 (1969). In upholding an identical one-year limitation in a surety bond we stated in Ribeira that:
Plaintiff's standing to sue North America arises solely by virtue of its status as a third-party beneficiary under the bond issued by Green Cast, as principal, and North America, as surety, to Jackson, as obligee. See 17 Am.Jur.2d, Contractors' Bonds, § 16 at 201-202. It is well-settled that "[a] third-party beneficiary's rights depend upon, and are measured by, the terms of the contract between the promisor and the promisee." Roehrs v. Lees, 178 N.J. Super. 399, 409 [429 A.2d 388] (App.Div. 1981). See also 17 Am.Jur.2d, Contracts, § 315 at 743; 2 Williston, Contracts (3 ed. 1959), § 364A at 873; 4 Corbin On Contracts, § 820 at 278. Moreover, a surety is chargeable only according to the strict terms of its undertaking, *437 and its obligation cannot be extended either by implication or by construction beyond the confines of its contract. Monmouth Lumber Co. v. Indemnity Insurance Co., 21 N.J. 439, 452 [122 A.2d 604] (1956).
... Additionally, we emphasize that the one-year limitation period contained in the bond is not against public policy or prohibited by New Jersey law simply because N.J.S.A. 2A:14-1 provides for a six-year statute of limitations upon a contractual claim. As stated previously, our courts have held such provisions to be valid and enforceable. [231 N.J. Super. at 21-22, 554 A.2d 1350.]
Similarly, New Jersey courts have routinely upheld contractual limitations that waive by express agreement the six-year statute of limitations. See e.g., A.J. Tenwood Assoc. v. Orange Sr. Cit. Housing, 200 N.J. Super. 515, 523-524, 491 A.2d 1280 (App.Div.), certif. denied, 101 N.J. 325, 501 A.2d 976 (1985); Staehle v. American Employers' Ins. Co., 103 N.J. Super. 152, 154, 246 A.2d 745 (App.Div. 1968). See also Weinroth v. New Jersey Mfrs. Ass'n Fire Ins. Co., 117 N.J.L. 436, 189 A. 73 (E. & A. 1937); 20A John A. Appleman & Jean Appleman, Insurance Law and Practice, Ch. 394, § 11683 (1980).
The running of the one-year limitation period contained in defendant's bond was to be triggered or commenced to run on the date Olsen "ceased work" on the project. The bond incorporated the construction contract by reference, which implies "work" to be the totality of obligations imposed upon Olsen by the contract and all related contractual documents, such as the bonds and purchase orders. While the term "work" is not specifically defined, the scope of the agreement between Olsen and Parkway as set forth in paragraph 1 of the contract reads:
SCOPE OF AGREEMENT:
The terms and conditions stated in this Agreement are applicable to the procurement by the Company of asbestos removal services and certain construction work, which shall include Contractor's obligation to furnish the supervision, engineering, tradesmen, equipment, vehicles, tools, materials, identification, packaging, labelling, transportation and disposal as required to perform the asbestos removal services and construction work as further defined in the applicable drawings and specifications (the "Work") attached hereto or referenced in the Orders placed pursuant to this Agreement.
To determine what triggered or commenced the running of the contractual limitation, not only must the work called for under the contract be ascertained, but also the words "ceases work" must be *438 construed. It is fundamental that where a "surety bond incorporates the prime construction contract by reference, the two, being integrated, must be considered together." Amelco Window Corp. v. Fed. Ins. Co., 127 N.J. Super. 342, 347, 317 A.2d 398 (App.Div. 1974). See also Graybar Electric Co. v. Continental Cas. Co., 50 N.J. Super. 289, 295, 142 A.2d 114 (App.Div. 1958); Acoustics, Inc. v. Hanover Ins. Co., 118 N.J. Super. 361, 364, 287 A.2d 482 (Law Div. 1971). Further, in determining the nature and extent of the liability of the surety, "the terms and provisions of a ... bond are to be construed with a view to discovering and giving effect to the intention of the parties thereto." Tp. of Wyckoff v. Sarna, 136 N.J. Super. 512, 516-17, 347 A.2d 16 (App.Div. 1975). In construing these bonds, Couch teaches that:
Initially, the liability of the surety on the contractor's bond is determined by the provisions of the bond, and cannot be extended beyond such provisions.
Although the surety bond is to be interpreted according to its provisions, as against a paid surety company, any ambiguity in a contractor's bond should be liberally construed in favor of laborers and materialmen, for whose benefit it was ostensibly executed.
The undertaking of a compensated surety is to be liberally construed, and where it is reasonably susceptible of two constructions, the one more favorable to the claimant will be adopted.
The doctrine of liberal construction has special application in favor of donee beneficiaries under the declared public policy of the state that they who supply labor and materials on public construction shall be paid. [13 Couch on Insurance 2d. § 47:183, at 335-36 (Rhodes rev. 1982).]
Reading the bond and contract together, we are satisfied that the parties intended that Olsen was to have broad authority to effectuate the removal of the asbestos, and that this included not only the furnishing of workers but also the supervision of the tradesmen and the storing of debris. Thus, the pivotal issue is when Olsen ceased work.
In V. Petrillo & Son, Inc., supra, 148 N.J. Super. at 4-5, 371 A.2d 799, we addressed the meaning of "ceases work" in the surety bond context. We held that a contractor ceases work when it discontinues or stops performing its obligations under the contract. We noted that "ceases work" does not require that the contractor complete the work called for under the contract, but *439 only that the contractor discontinue its obligations under the contract. With regards to the meaning of "ceases work," we specifically stated:
The trial judge construed the term "ceases work" to mean "completes work." We recognize the principles concerning the construction of surety bonds and the policy of the law to favor materialmen and laborers in cases of doubtful or uncertain construction of the language contained in surety bonds. See Amelco Window Corp. v. Fed'l Ins. Co., 127 N.J. Super. 342, 349-350 [317 A.2d 398] (App.Div. 1974); 17 Am.Jur.2d Contractors Bonds, § 3 (1964). The word "cease" is defined by Webster's New International Dictionary 2 Ed. unabr. as meaning to discontinue, refrain, end, stop, quit, leave off. The record clearly demonstrates that American discontinued or left off performing its obligations under the contract in December 1972, when the last subcontractor performed construction work on the project. The language of the bond should be given a common sense meaning and not tortured to reach a particular result. The non-issuance of a certificate of final acceptance by the owner is at best evidence that the general contractor has not completed its work under the contract. The non-issuance of such certificate does not control the common understanding of when the general contractor "ceased work" on the job. The trial judge's interpretation of the term "ceased work" subjects the surety to legal exposure over a long period of time, perhaps years after the project has in fact been completed and occupied for its intended use. Even at this late date the surety's liability to suit would be extant because the certificate of final approval has not been issued, surely not a result contemplated by the parties to the bond and contract. We hold the phrase "completes work" cannot be used interchangeably with the phrase "ceases work" in this bond. [Ibid.]
Applying these principles here and accepting as true all evidence which supports plaintiff's position, and giving plaintiff the benefit of all favorable inferences which could be drawn from the evidence, the proofs could support a finding that plaintiff instituted this action within the one-year limitation period set forth in the bond. While the statement of Edward Puth, the managing agent of Parkway, as to when Olsen ceased work was somewhat imprecise, a jury reasonably could have inferred that the "mid-90's" meant June or July of 1990, thereby making plaintiff's suit timely. Additionally, the proofs also showed that the trailers rented by Olsen remained on site as late as August of 1990 and that plaintiff worked on the site until June or July of 1990. In sum, the proofs raised a factual issue for resolution by the jury as to whether Olsen was still working or supervising after May 23, 1990. Therefore, the trial court properly denied defendant's motion for judgment of involuntary dismissal at the conclusion of the proofs, and *440 properly submitted to the jury the issue as to whether Olsen ceased work on the project before May 23, 1990.
However, the trial court erred in submitting to the jury the issue as to whether the one-year limitation period contained in the bond was tolled by defendant's conduct. The trial court instructed the jury, in pertinent part as follows:
If you find that the plaintiff, Eagle Fire Protection, filed it's action more than one year after the general contractor, Olsen & Hassold, ceased work at the site, then you should enter a verdict for the defendant of no cause of action.
I further instruct you that the work done by subcontractors of Olsen & Hassold, does not constitute work by Olsen & Hassold themselves. And therefore the presence or absence of such subcontractors at the site after May 23rd, 1990 is not relevant.
Unless you specifically find that any representative of the defendant, First Indemnity, misled by accident or design Mr. Massell so as to cause him to delay filing a timely suit under the bond and he did not do so, you should return a verdict for the defendant.
I should tell you this, a surety company such as the defendant in this case, is bound only to the strict terms of its contract and its obligations cannot and should not be extended by implication or construction beyond the confines of its contract.
The trial court then submitted the following special interrogatories to the jury:
1) Did the work by Olsen & Hassold on the project cease before May 23, 1990?
ANSWER: YES ____ NO ____
If your answer to this question is NO, cease deliberations and return a verdict in favor of the plaintiff in such amount as you deem to be the unpaid balance of the contract. If your answer to this question is YES, proceed to Question # 2.
2) Did the negotiations, conversations and communications between the plaintiff and the defendant result in the plaintiff being caused to delay the filing of suit until May 23, 1991?
ANSWER: YES ____ NO ____
If your answer to this question is YES, return a verdict in favor of the plaintiff in such amount as you deem to be the unpaid balance of the contract.
3) If your answer to Question # 1 is "YES" and your answer to Question # 2 is "NO", return a verdict of no cause of action in favor of the defendant.
ANSWER: ____
The jury answered the first two questions "Yes" and then assessed damages at $63,414.
*441 Generally, the tolling of contractual or statutory limitations requires conduct sufficient to invoke the doctrine of equitable estoppel. The doctrine of equitable estoppel has been defined as:
[T]he effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse.... Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442, 449 [217 A.2d 617], cert. denied, 385 U.S. 834, 87 S.Ct. 77, 17 L.Ed.2d 68 (1966) (quoting 3 Pomeroy's Equity Jurisprudence § 804 (5th ed. 1941)).
Conduct amounting to a misrepresentation or concealment of material facts, known to the party allegedly estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and on which the other party does in fact rely in such a manner as to change his position for the worse gives rise to an equitable estoppel. [Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334, 339, 403 A.2d 880 (1979).]
Thus, equitable estoppel may be appropriate where "a defendant has lulled a plaintiff into a false sense of security by representing that a claim will be amicably settled without the necessity for litigation." Lawrence v. Bauer Publishing & Printing, Ltd., 78 N.J. 371, 376, 396 A.2d 569 (1979). See also W.V. Pangborne & Co. v. N.J. DOT, 116 N.J. 543, 554, 562 A.2d 222 (1989). The application of the doctrine in such circumstances will "prevent a defendant from asserting the statute of limitations in contract actions that have entailed extensive settlement negotiations." Id. at 556, 562 A.2d 222.
The tolling of a contractual or statutory limitation due to conduct, requires some type of unconscionable conduct on the part of the insurance company and not just mere negotiations or discussions. See e.g., Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442, 449, 217 A.2d 617 (1966), cert. denied sub nom., 385 U.S. 834, 87 S.Ct. 77, 17 L.Ed.2d 68 (1966); D. & K. Landscaping Co. v. Great American Ins. Co., 191 N.J. Super. 448, 451, 467 A.2d 581 (App.Div. 1983); Tantum v. Binz, 186 N.J. Super. 296, 304, 452 A.2d 667 (App.Div. 1981), rev'd on dissent, 91 N.J. 426, 452 A.2d 667 (1982). See also, Bowler v. Fidelity & Cas. Co., 53 N.J. 313, 328, 250 A.2d 580 (1969); Friedman v. Friendly Ice Cream Co., 133 N.J. Super. 333, 337-38, 336 A.2d 493 (App.Div. 1975); *442 Howard v. West Jersey and Seashore R.R. Co., 102 N.J. Eq. 517, 522, 141 A. 755 (Ch. 1928), aff'd, 104 N.J. Eq. 201, 144 A. 919 (E. & A. 1929). Other jurisdictions are in accord. See e.g., Krugman and Fox Const. v. Elite Assoc., Inc., 167 A.D.2d 514, 515, 562 N.Y.S.2d 188, 190 (1990), appeal denied, 77 N.Y.2d 806, 571 N.E.2d 83, 568 N.Y.S.2d 913 (1991), wherein the New York Appellate Division stated:
The plaintiff, asserting, inter alia, that it was lulled into inaction as a result of its continued communications with both the principal and the sureties, concludes that the sureties waived their rights under the bond and are estopped from asserting the contractual limitation period. Our review of the record, however, indicates, that the evidence submitted by the plaintiff is insufficient to give rise to waiver or estoppel.
It is well established that "[e]vidence of communications or settlement negotiations between an insured and its insurer either before or after expiration of a limitations period contained in a policy is not, without more, sufficient to prove waiver or estoppel." (Culinary Inst. of Am. v. Aetna Cas. & Sur. Co., 151 A.D.2d 638, 639, 542 N.Y.S.2d 705, quoting Gilbert Frank Corp. v. Federal Ins. Co., 70 N.Y.2d 966, 968, 525 N.Y.S.2d 793, 520 N.E.2d 512).
Additionally, one commentator addressing estoppel with respect to a surety, has noted:
Where a time limitation is contained in a policy or bond, such limitation, being for the benefit of the company, may be waived, and, where a waiver is shown, the surety cannot rely upon such limitation to defeat recovery. Where the surety has by its conduct induced a delay, or misled the obligee, a waiver may result or estoppel may be found. Estoppel will also result where the surety by its words, acts, and conduct leads the other party to believe that it would acknowledge and pay the claim if, after investigation, the claim was found to be just, but when, after the time for suit had passed, breaks off negotiations and denies liability and refuses to pay...
In the absence of conduct creating an estoppel, it has been held that a waiver of a time limitation must be by agreement supported by a valuable consideration. Thus, ordinary conduct on the part of the surety, not misleading the obligee nor constituting a renunciation of the right to invoke the contractual limitation, does not amount to a waiver. [20A John A. Appleman and Jean Appleman, Insurance Law and Practice, Ch. 394, § 11691 (1980).]
Accepting as true all evidence which supports plaintiff's claim that defendant waived the one-year limitation period contained in the bond and giving plaintiff the benefit of all favorable inferences which could be drawn from such evidence, we are satisfied based on this record that the trial court erred in submitting the waiver *443 issue to the jury. The discussions with respect to plaintiff's claim that took place between plaintiff's agent Massell and defendant's agents Alongi and Galdieri were not of such a nature as to toll the running of the bond's one-year limitation period or estop defendant from defending this claim on the ground that it was time-barred. Galdieri was simply seeking information with respect to a pending claim, which is a normal responsibility of a claims investigator. Galdieri's conduct in carrying out that responsibility cannot reasonably be viewed as unconscionable or as having misled plaintiff into believing that its claim would be paid under any circumstances even if the time limitations for instituting suit under the bond had passed.
Moreover, neither Alongi nor Galdieri ever told Massell not to file suit. Massell was a lawyer who had represented insurance companies in the past and knew full well that the bond in issue contained a one-year limitation period for filing suit. In fact, Massell notified defendant of the default by Olsen, demanded payment and threatened to file suit within twenty days if settlement was not forthcoming. Although Galdieri discussed the claim with Massell on numerous occasions and sought information in order to process plaintiff's claim, Galdieri did not lull Massell into a false sense of security by representing that plaintiff's claim would be paid without the necessity of filing suit. To the contrary, Massell admitted that Galdieri informed him that if he felt there was "a stall job," he should file suit.
Furthermore, as late as January 29, 1991, Galdieri informed Massell that his inability to verify the details of the claim was holding up payment. Galdieri therefore requested Massell to furnish him with a copy of the contract and invoices to verify the payments that had been made to plaintiff, and the balance due plaintiff under the contract. Massell agreed to furnish the requested documents and information. On February 4, 1991, Galdieri again brought to Massell's attention the need to verify the details of the claim. Finally, Galdieri and Massell last spoke on February 8, 1991. Notwithstanding Galdieri's attempt to obtain *444 the necessary claim information, Massell failed to provide Galdieri with the requested information at any time after February 8, 1991 and no further communication or discussion took place between Galdieri and Massell after that date. On May 23, 1991, more than three months after Galdieri's last request for information, plaintiff instituted this action.
In sum, the one-year limitation period contained in the bond was not tolled by defendant's communications with plaintiff and defendant was not estopped from raising the time-bar as a defense. Consequently, the trial court should not have submitted this issue to the jury. The only issue that should have been submitted to the jury was whether plaintiff instituted this action within one year after Olsen ceased work on the project. Since the jury specifically found, in response to a special interrogatory, that Olsen completed its work on the project before May 23, 1990, plaintiff's action against defendant, instituted on May 23, 1991, was time-barred. Neither Massell's belief as to the date that Olsen completed its work on the project nor Alongi's and Galdieri's discussions with Massell and their request for claim information were sufficient to toll the running of the one-year limitation of the bond or estop defendant from asserting the contractual time-bar. Therefore, after the jury found that Olsen ceased work on the project before May 23, 1990, the trial court should have entered judgment in favor of defendant for no cause for action. Since we reverse the judgment in favor of plaintiff and direct the entry of judgment in favor of defendant, we do not reach or decide defendant's contention that the trial court's charge to the jury concerning the failure to file suit within the one-year limitation period of the bond was erroneous and misleading, or plaintiff's claim for counsel fees raised on the cross-appeal.
Accordingly, the judgment under review is reversed and the matter is remanded to the trial court for the entry of a judgment of no cause for action in favor of defendant.