678 A.2d 699

EAGLE FIRE PROTECTION CORP., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. FIRST INDEMNITY OF AMERICA INSURANCE COMPANY, DEFENDANT–RESPONDENT.

Argued January 29, 1996—Decided July 22, 1996.

*Joseph C. Glavin, Jr.*, argued the cause for respondent.

*Armen Shahinian* submitted a brief on behalf of amicus curiae, The Surety Association of America (*Wolff & Samson*, attorneys; *Mr. Shahinian, James D. Ferrucci* and *Joseph Monaghan*, on the brief).

The opinion of the court was delivered by

GARIBALDI, J.

This appeal concerns the resolution of one question: in determining the one-year limitation period under which a claimant must

institute a suit in a surety bond, when does a general contractor "cease work" under a construction contract? Specifically, we must determine if the work of subcontractors on a construction site constitutes the work of the general contractor.

I

In May 1989, 185 Monmouth Parkway Associates (Parkway), a limited partnership, finalized its plans to renovate an office building. Pursuant to those plans, on May 8, 1989, Parkway hired Olsen & Hassold, Inc. (Olsen), as general contractor in charge of the renovation. The contract between Parkway and Olsen envisioned three phases. In Phase I, Olsen was to remove the asbestos in the building. Phase II consisted of the reconstruction and restoration of the building, and in Phase III, Olsen was to erect certain metal partitions in the building. Olsen never reached Phase III due to its financial demise.

One of Olsen's obligations under the contract was to hire a surety company that would guarantee Olsen's successful performance of its contractual duties. As a result, Olsen purchased a series of bonds from First Indemnity of America Insurance Co. (First Indemnity), who agreed to act as Olsen's guarantor. The particular bond implicated in this case is a "labor and material bond." That bond provided that First Indemnity, as surety, would pay claims made by subcontractors of Olsen, as principal, where the contractors had not been paid in full within ninety days of the completion of the subcontractor's work. In drafting that bond, the parties simply filled in the blanks of the American Institute of Architects' standard labor-and-material payment-bond form.

The Phase II renovation of the Parkway building included the installation of a sprinkler system in the building. Olsen purchased the sprinkler system from Eagle Fire Protection Corp. (Eagle Fire), and hired it to install the system for $129,437.50. Eagle Fire started working on the project in mid-September 1989 and completed it in June or July of 1990. Olsen made progress payments to Eagle Fire from October 1989 to early 1990. Howev-

er, a later installment check from Olsen bounced, and by May 1990, Olsen had stopped making payments to Eagle Fire. When Eagle Fire's president, William Vinsko, began to sense that he would have difficulty collecting from Olsen, he attempted to contact First Indemnity regarding its obligation under the bond. However, First Indemnity failed to return numerous calls made by a Parkway representative on Eagle Fire's behalf. Vinsko then retained counsel, Gerald Massell, Esq., to obtain from Olsen or First Indemnity the money owed Eagle Fire for the sprinkler system installation. Massell spoke with an Olsen vice-president about Olsen's debt in April or May 1990, but was unable to elicit payment from Olsen. Massell was similarly unsuccessful in his eight month effort to persuade First Indemnity to pay Olsen's debt to Eagle Fire.

On September 11, 1990, Parkway terminated its contract with Olsen. In April 1991, Olsen filed for bankruptcy. On May 23, 1991, Eagle Fire filed suit against First Indemnity, claiming that the bond rendered First Indemnity liable for Olsen's sprinkler-system debt. The sole defense offered by First Indemnity was that Eagle Fire had not commenced its suit in a timely manner, and was thus precluded from recovering under the bond. First Indemnity based that argument on the following provision of the bond:

*No suit or action shall be commenced hereunder by any claimant:*

b) *After the expiration of one (1) year following the date on which [Olsen] ceased work on [the] Contract,* it being understood, however, that if any limitation embodied in this bond is prohibited by any law controlling the construction hereof such limitation shall be deemed to be amended so as to be equal to the minimum period permitted by such law. (Emphasis added).

Eagle Fire countered that it had, in fact, commenced its suit within one year of the day that Olsen "ceased work" on the contract. Eagle Fire argued in the alternative that if its suit had not been commenced in a timely manner, that was the fault of First Indemnity's representatives, who employed delaying tactics and misled Eagle Fire into not bringing suit within the specified one-year window.

The testimony at trial focused on two issues: 1) the date Olsen "ceased work" under the contract; and 2) the actions taken by First Indemnity that led Eagle Fire not to file suit until eight months after its initial contact with the surety company.

To establish its compliance with the bond's limitation period, Eagle Fire had to prove that Olsen "ceased work" after May 23, 1990. Edward Puth, a managing agent for Parkway, testified that Olsen was working under the contract until September 11, 1990, when Parkway terminated the contract because of Olsen's financial inability to fulfill its contractual duties. In support of that conclusion, Puth discussed the presence on the worksite through September 1990 of trailers that Olsen had rented to store partitions that were to be used in Phase III. Those trailers led Puth to conclude that Olsen was "working" under the contract until its ultimate cancellation. Puth admitted that at some time prior to the cancellation of the contract, although he could not remember the exact date, Olsen stopped paying the rental company for the use of trailers. The last time that Puth saw an Olsen employee on the site was "mid–1990." That employee was Edward LaHaye, the Vice–President of Olsen's asbestos removal division, with whom Puth met on that occasion. Puth did not know the last day that Olsen employees were physically working on the site.

William Vinsko testified for Eagle Fire that Olsen was "still on the job" as of January or February of 1990, working in different parts of the building. Defense counsel read to the jury Vinsko's deposition testimony, in which he stated that Olsen had left the site by January 1990. Vinsko testified that Olsen's subcontractors were working at the site through July and August of 1990, and perhaps even later.

Ed LaHaye testified for First Indemnity that the last day that Olsen employees physically worked at the site under the contract was September 8, 1989. He conceded, however, that when he resigned from his position with Olsen in August 1990, the metal partitions were still being stored in trailers on the site.

Eagle Fire also attempted to establish that First Indemnity impermissibly misled or lulled Eagle Fire into not filing suit on an earlier date. Massell testified that his first attempt to obtain payment from First Indemnity was on September 18, 1990, when he wrote to the surety company to inform it that Olsen had defaulted on its debt to Eagle Fire. He warned, "If this matter cannot be settled within twenty (20) days, I will file suit against First Indemnity." On September 28, 1990, Massell received a proof of loss form and a short note from Paul Alongi, Operations Manager at First Indemnity. In the note Alongi informed Massell that on receipt of the completed proof of loss form First Indemnity would begin its investigation into the validity of Eagle Fire's claim. On November 30, 1990, Massell returned the completed proof of loss to First Indemnity and four days later he had a telephone conversation with Alongi regarding the claim. Although Massell made subsequent attempts to reach Alongi, Massell never heard from Alongi.

From December 7, 1990 to February 1991, Massell had several telephone discussions with Frank Galdieri, an independent claims adjuster hired by First Indemnity to investigate Eagle Fire's claim. In a December 10, 1990 conversation, Galdieri told Massell that if Massell felt that First Indemnity was attempting to stall, he should file suit. Massell memorialized this conversation in a December 10, 1990 letter that he sent to Galdieri. After a conversation that Massell had with Galdieri in February 1991, he began to believe that First Indemnity was employing stalling tactics and was not negotiating in good faith. Massell filed suit approximately three months later. Galdieri testified for First Indemnity, and, in general, did not dispute Massell's testimony. Massell acknowledged in his testimony that Galdieri never told him not to file suit.

At the close of all the evidence both parties made a motion for judgment. The trial court denied both motions. The trial court instructed the jury, in pertinent part:

If you find that the plaintiff, Eagle Fire Protection, filed it's action more than one year after the general contractor, Olsen & Hassold, ceased work at the site, then you should enter a verdict for the defendant of no cause of action.

*I further instruct you that the work done by subcontractors of Olsen & Hassold does not constitute work done by Olsen and Hassold themselves. And therefore the presence or absence of such subcontractors at the site after May 23, 1990, is not relevant.* Unless you find that any representative of the defendant, First Indemnity, misled by accident or design Mr. Massell so as to cause him to delay filing a timely suit under the bond and he did not do so, you should return a verdict for the defendant. (Emphasis added).

The court also submitted the following special interrogatories to the jury:

1) Did the work by Olsen and Hassold on the project cease before May 23, 1990?

2) Did the negotiations, conversations and communications between the plaintiff and the defendant result in the plaintiff being caused to delay the filing of the suit until May 23, 1991?

Prior to answering those interrogatories the jury asked the court "If there are subcontractors on the site, does that mean that Olsen and Hassold would be considered to be on the site?" The trial court stated that "[T]he answer is no." Plaintiff's counsel who had objected to the court's original instruction regarding the instruction that subcontractor's work should be deemed the work of Olsen, also objected to the court's response to the jury's question. The jury answered both questions in the affirmative, returned a verdict for Eagle Fire, and assessed damages at $63,414. On stipulation of the parties, the trial court reduced the award to $60,825. The trial court rejected Eagle Fire's ensuing application for attorney's fees.

The Appellate Division reversed. *Eagle Fire v. First Indemnity Insurance Corp.,* 280 *N.J.Super.* 430, 655 *A.*2d 939 (App.Div. 1995). The court found that the "the proofs raised a factual issue for resolution by the jury as to whether Olsen was still working or supervising after May 23, 1990." *Id.* at 439, 655 *A.*2d 939. Thus, the court concluded that the trial court properly decided not to rule as a matter of law on that issue. *Id.* at 439–40, 655 *A.*2d 939. The panel held however, that "the trial court erred in submitting to the jury the issue as to whether the one-year limitation period contained in the bond was tolled by defendant's conduct." *Id.* at

440, 655 A.2d 939. The court explained that "the tolling of a contractual or statutory limitation due to conduct, requires some type of unconscionable conduct on the part of the insurance company and not mere negotiations and discussions." *Id.* at 441, 655 A.2d 939. Because Galdieri's conduct could not be said to have misled or lulled Massell into a false sense of security, the court concluded as a matter of law that the Bond's one-year limitation period was not tolled by First Indemnity's ongoing investigation of Eagle Fire's claim. *Id.* at 443–44, 655 A.2d 939. Accordingly, the court found that Eagle's Fire's suit was untimely. *Id.* at 444, 655 A.2d 939.

We granted Eagle Fire's petition for certification. 142 *N.J.* 457, 663 A.2d 1363 (1995), and now reverse.

## II

"Suretyship is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default or miscarriage of another, the principal." *Amelco Window Corp. v. Fed. Ins. Co.,* 127 *N.J.Super.* 342, 346, 317 A.2d 398 (App.Div.1974). First Indemnity, the surety, agreed to be answerable for the debts of Olsen, the principal. The express language of the Labor and Material Bond entered into by Olsen and First Indemnity also granted Eagle Fire and any other Olsen subcontractors standing to enforce the bond's provisions. *See Schlanger v. Federal Ins. Co.,* 44 *N.J.* 17, 20, 206 A.2d 874 (1965) and *Amelco Window Corp., supra,* 127 *N.J.Super.* at 346–47, 317 A.2d 398. The bond defined a claimant as

one having a direct contract with the Principal or with a subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the Contract.

Because Eagle Fire had a direct contract with the principal, Olsen, it had standing as a third party beneficiary under the bond between Olsen and First Indemnity. "The Law recognizes that the third party has an enforceable right if the surety promises in the bond, either in express words or by reasonable implication, to

pay money to him." *Amelco Window Corp., supra,* 127 *N.J.Super.* at 346, 317 *A.*2d 398.

■ As a third party beneficiary of the bond, Eagle Fire's rights are determined by the terms of the bond. "It is well settled that '[a] third party beneficiary's rights depend upon, and are measured by, the terms of the contract between the promisor and the promisee.'" *Ribeira & Lourenco Concrete Constr., Inc. v. Jackson Health Care Associates,* 231 *N.J.Super.* 16, 21, 554 *A.*2d 1350 (App.Div.1989), *aff'd o.b.,* 118 *N.J.* 419, 571 *A.*2d 1311 (1990) (quoting *Roehrs v. Lees,* 178 *N.J.Super.* 399, 409, 429 *A.*2d 388 (App.Div.1981)). In *Monmouth Lumber Co. v. Indemnity Ins. Co. of N. America,* 21 *N.J.* 439, 452, 122 *A.*2d 604 (1956), the Court observed, however, that "a surety is chargeable only according to the strict terms of its undertaking and its obligation cannot and should not be extended either by implication or by construction beyond confines of the contract." First Indemnity argues that time limitations particularly should be construed strictly in surety bonds guaranteeing the debts of construction companies since so many of those companies dissolve within a short period of time.

## III

Contract provisions limiting the time parties may bring suit have been held to be enforceable, if reasonable. *See Weinroth v. New Jersey Mfrs. Ass'n Fire Ins. Co.,* 117 *N.J.L.* 436, 438, 189 *A.* 73 (E. & A.1936); *Ribeira, supra,* 231 *N.J.Super.* at 22–23, 554 *A.*2d 1350; *A.J. Tenwood Assocs. v. Orange Senior Citizens Housing Co.,* 200 *N.J.Super.* 515, 523–24, 491 *A.*2d 1280 (App. Div.), *certif. denied,* 101 *N.J.* 325, 501 *A.*2d 976 (1985); *Staehle v. American Employers' Ins. Co.,* 103 *N.J.Super.* 152, 154, 246 *A.*2d 745 (App.Div.1968).

Holding enforceable a provision in an insurance contract limiting the time in which claimants may bring suit to one year, the Court in *Weinroth, supra,* observed:

In determining whether any provision in an insurance contract conflicts with general laws of this state, the test should be whether the terms provide for, or

permit, that which the statute forbids and prohibit. We are unable to observe any conflict, as the statute provides, in effect, that no suit can be instituted after six years, but does not make it unlawful for parties to agree by contract that the limitation shall be for a lesser period.

[*Weinroth, supra,* 117 *N.J.L.* at 438, 189 *A.* 73].

Similarly, in *A.J. Tenwood Associates, supra,* the Appellate Division found that a one-year limitation period contained in the construction contract was neither unfair nor unreasonable. 200 *N.J.Super.* at 523, 491 *A.*2d 1280. The court observed that although the statute of limitations in New Jersey for contract actions is six years, "such a limitation may be waived by express agreement of the parties." *Ibid.* (citation omitted). "It is fundamental that in the absence of a statute barring such agreements, a contractual stipulation limiting the time for bringing an action upon a contract to a period less than that prescribed by the foregoing statute is valid if the stipulated period is reasonable and does not violate public policy." *Id.* at 523–24, 491 *A.*2d 1280 (citations omitted).

Finally, *Ribeira & Lourenco Concrete Constr., Inc., supra,* involved a labor and material payment bond that contained the same one-year limitation provision found in the bond in this case. 231 *N.J.Super.* at 22, 554 *A.*2d 1350. The Appellate Division found the provision to be reasonable and therefore enforceable, *id.* at 22–23, 554 *A.*2d 1350, and we affirmed that decision. 118 *N.J.* 419, 571 *A.*2d 1311 (1990).

Indeed, this Court has routinely upheld contract provisions that create a one-year time limitation in which claimants may bring suit. Accordingly, the one-year limitation provision in First Indemnity's surety bond was reasonable and enforceable. Therefore, Eagle Fire's ability to recover under the bond will depend on whether Eagle Fire filed suit within one year of the date that Olsen "ceased work" under the contract. In ascertaining the meaning of the term "ceased work," the central goal, as in interpreting contract language generally, is to give effect to the intent of the parties to the bond. *See Washington Construction Co., Inc. v. Spinella,* 8 *N.J.* 212, 217, 84 *A.*2d 617 (1951); *Town-*

*ship of Wyckoff v. Sarna,* 136 *N.J.Super.* 512, 516–17, 347 *A.*2d 16 (App.Div.1975).

■ "It has long been settled law that a surety is chargeable only according to the strict terms of its undertaking and its obligations cannot and should not be extended either by implication or by construction beyond the confines of its contract." *See Monmouth Lumber Co. v. Indemnity Ins. Co. of N. America,* 21 *N.J.* 439, 452, 122 *A.*2d 604 (1956); *Peoples National Bank of N.J. v. Fowler,* 73 *N.J.* 88, 101, 372 *A.*2d 1096, *cert. den,* 434 *U.S.* 858, 98 *S.Ct.* 182, 54 *L.Ed.*2d 131 (1977). That rule, however, has been modified, if the language in the construction bond is ambiguous. In *V. Petrillo & Son, Inc. v. American Const. Co.,* 148 *N.J.Super.* 1, 371 *A.*2d 799 (App.Div.), *certif. denied,* 75 *N.J.* 4, 379 *A.*2d 235 (1977), the court recognized "the principles concerning the construction of surety bonds and the policy of the law to favor materialmen and laborers in cases of doubtful or uncertain construction of the language contained in the surety bonds." *Id.* at 4–5, 379 *A.*2d 235 (citations omitted). *See also* 17 Am.Jur.2d *Contractor's Bonds* § 6 (1990) (citing cases) and 13 George J. Couch, *Couch on Insurance* § 47:183 (2d ed. rev.vol.1982) ("Initially, the liability of the surety on the contractor's bond is determined by the provisions of the bond, and cannot be extended beyond such provisions. Although the surety bond is to be interpreted according to its provisions, as against a paid surety company, any ambiguity in a contractor's bond should be liberally construed in favor of laborers and materialmen, for whose benefit it was ostensibly executed.").

■ The bond between Olsen and First Indemnity incorporates the contract by reference ("whereas, Olsen and Hassold, Inc. Principal has by written agreement dated May 8, 1989, entered into a contract with Owner for re-insulated structure & install sprinkler systems. . . ."). Therefore, in ascertaining the meaning of the bond's provisions, the bond and the contract must be considered as one integrated document. *E.g., Schlanger, supra,* 44 *N.J.* at 20, 206 *A.*2d 874; *Amelco Window Corp., supra,* 127

*N.J.Super.* at 347, 317 *A.*2d 398. *See also* 17 Am.Jur.2d *Contractors' Bonds* § 7 (observing that "A contractor's bond should be construed in connection with, and in the light of, [the] contract with which it was executed or the performance of which it secures, especially where the bond refers to the contract and makes it part of the bond. Thus, the bond, the contract, and the specifications constitute an integrated obligation, and are to be read together.")

■ To determine whether Eagle Fire filed suit within one year to the date that Olsen "ceased work" on the project, we first must define what "work" means in the context of the contract between Olsen and Parkway Associates. The bond does not define the term "work." However, the contract does provide come guidance on this issue. The first section of the contract reads as follows:

1. *Scope of Agreement*

The terms and conditions stated in this Agreement are applicable to the procurement by the Company of asbestos removal services and *certain construction work, which shall include Contractor's obligation to furnish the supervision,* engineering, tradesmen, equipment, vehicles, tools, materials, identification, packaging, labeling, transportation and disposal as required to perform the asbestos removal services *and construction work as further defined in the applicable drawings and specifications (the "Work") attached hereto or referenced in the orders placed pursuant to this Agreement.* (Emphasis added).

That language supports Eagle Fire's contention that Olsen ceased its "work" on the contract after May 23, 1990. First, the Scope of Agreement section notes that "Work" is defined in the "drawings and specifications" attached to the contract and in the "Orders placed pursuant to" the contract. That is significant because a purchase order calling for Olsen to "store partitions on site in trailers" was attached to the contract as Exhibit A–1. Moreover, Parkway's bid specifications, attached to the contract as Exhibit–C, also noted the general contractor's obligation to store the partitions in the trailers well past May 23, 1990.

A second basis for concluding that Olsen ceased working after May 23, 1990, is the undisputed testimony that Olsen subcontractors were working under the contract as late as July or August of 1990. That the work of the subcontractors constituted work of the general contractor gains support from the language of the con-

tract. As stated in the Scope of Agreement section of the contract, Olsen's "work" included "furnish[ing] the supervision" of the construction work. Edward Lahaye, an Olsen vice-president, confirmed that part of Olsen's contractual duties was to supervise the subcontractors. That conclusion is supported by Section 34 of the contract, which discusses the "work" performed by subcontractors and Section 36 of the contract, which discusses Olsen's duty to supervise its subcontractors.

In today's business world, a general contractor may determine not to undertake any physical labor on the work site and instead contract out all of the work to subcontractors. In that context, if "work" of the general contractor does not include the work of its subcontractors, the general contractor would be deemed to cease work the same day that it signed its contract with the owner of the project (or the day that the general contractor hired its last subcontractor). If the subcontractors' work took longer that one year, the bond's limitation period would expire before the subcontractors finished their work. That result could not be what the parties to the bond intended.

The problems with defining "work" to exclude the work of the subcontractor of a general contractor are demonstrated in this case. The bond contains a provision that bars claimants from bringing suit "before the expiration of 90 days after the date on which the last of such claimant's work or labor was done or performed." Thus, if one accepts First Indemnity's argument that Olsen ceased working under the contract on September 8, 1989, then Eagle Fire, which completed the installation of the sprinkler system in June or July of 1990, would have had at the most ten days to bring suit. Specifically, if Eagle Fire completed its work on June 1, 1990, then the first day that it could have filed its complaint would have been ninety-one days later, August 30. Eagle Fire's deadline for filing suit was September 8, 1990, one year after Olsen allegedly ceased work. Hence, Eagle Fire would have had only ten days to file suit.

 If Eagle Fire completed its work any time after June 10, 1990, then the ninety day period would have ended after September 8, 1990, and Eagle Fire would not have had any opportunity to file a complaint against First Indemnity. Such a severe restriction on Eagle Fire's ability to bring suit would be both unreasonable and unenforceable. *See Camelot Excavating Co., Inc. v. St. Paul Fire and Marine Insurance Co.*, 410 *Mich.* 118, 301 *N.W.*2d 275, 277, 282 (1981). In *Camelot, supra,* the Michigan Supreme Court, addressing what is a reasonable contractual provision for a time limitation in which all claimants must bring suit, observed:

The boundaries of what is reasonable under the general rule require that the claimant have sufficient opportunity to investigate and file an action, that the time not be so short as to work a practical abrogation of the right of action, and that the action not be barred before the loss or damage can be ascertained.

[*Id.* 301 *N.W.*2d at 277 (citations omitted)].

The Court added that a contractual limitation period would be unreasonable and, therefore, unenforceable if the "provision [had] been constructed in such way that plaintiff could not have reasonably discovered its loss prior to the point at which the limitation period ran." *Id.* at 282.

The limited case law in this area supports the conclusion that Olsen's work included the work performed by its subcontractors. In *V. Petrillo & Son, Inc., supra,* a construction subcontractor brought an action against its general contractor for amounts due for construction work performed on a moderate-income housing project partially financed by the New Jersey Housing Finance Agency. 148 *N.J.Super.* at 2–3, 371 *A.*2d 799. Prior to trial, the general contractor, American Construction Co., was declared bankrupt. *Id.* at 3, 371 *A.*2d 799. The defendant, St. Paul Fire and Marine Insurance Company (St. Paul), had issued a Labor and Materials Payment Bond, and defended on the basis that the plaintiff had not complied with the notice requirements of the bond and had failed to file suit in a timely manner. *Ibid.*

The bond contained a time limitation provision requiring the plaintiff to institute suit against St. Paul within one year after American "ceased work" under the contract. The bond incorpo-

rated the construction contract by reference and the contract defined work as "the totality of obligations imposed upon the contractor by all contract documents." *Ibid.* The evidence at trial demonstrated the following: (1) the plaintiff last performed work on the property on August 17, 1972; (2) the defendant, American, last performed work on the project on Oct. 4, 1972; and (3) the last work done by any subcontractor was December 1972. *Ibid.* In May 1974, eighteen months after the last subcontractor performed work, the plaintiff instituted suit. *Ibid.* The contract also directed the owner of the property to issue a certificate of final acceptance after the correction of all construction defects. *Ibid.* A certificate was never issued. *Ibid.*

Construing the term "ceases work" to mean "completes work," the trial judge found that because a certificate of final acceptance had never been issued, the general contractor had never ceased work within the meaning of the contract. *Id.* at 4, 371 *A.*2d 799. Although rejecting the trial court's interpretation, the Appellate Division found "the record clearly demonstrates that American discontinued or left off performing its obligations under the contract in December 1972, when the last subcontractor performed construction work on the project." *Id.* at 5, 371 *A.*2d 799. Because the plaintiff failed to file its complaint within one year of the date that the last subcontractor performed, the court found that the plaintiff's action was time barred. *Id.* at 7, 371 *A.*2d 799. *Accord Honeywell, Inc. v. Babcock,* 68 *Wash.*2d 239, 412 *P.*2d 511, 514 (1966)(construing limitation period in standard labor and material bond and concluding that general contractor "ceased work" when "his subcontractors had finished their work.").

■ The *Petrillo* decision, thus, stands for the proposition that a general contractor does not "cease work" if the subcontractors are still working under the contract. The plaintiff in *Petrillo* failed to comply with the time limitation provision in the bond, filing suit more than a year after the last subcontractor performed work under the contract. We recognize that there may be instances where, due to the general contractor's poor financial

record, the owner may hire the subcontractor to work directly for it and pay the subcontractor directly for its work. In that situation the subcontractor is no longer working for the general contractor, and his work would not be deemed the work of the general contractor. Although Parkway did pay Eagle Fire for some additional work, Mr. Puth testified that that payment was for additional work, not the work contemplated or done under the Olsen and Parkway contract.

First Indemnity asserts that *Ribeira & Lourenco Concrete Construction, Inc., supra,* 231 *N.J.Super.* 16, 554 *A.*2d 1350, supports its argument that the actions of subcontractors are irrelevant to the determination of when the contractor ceased work. In that case, a general contractor subcontracted its entire job to Green Cast Enterprises, Inc., which, in turn, subcontracted the work to various other companies, including the plaintiff. *Ribeira, supra,* 231 *N.J.Super.* at 19–20, 554 *A.*2d 1350. The bond at issue stated that subcontractors could bring suit against the surety only within one year of the date that Green Cast ceased work on the project. *Id.* at 21, 554 *A.*2d 1350. Finding the suit untimely, the court stated: "We are [ ] satisfied that the one-year [limitation] period ... ran from the date that Green Cast ceased work on the project, not from the date that the last subcontractor ... completed its work under the contract." *Id.* at 24, 554 *A.*2d 1350. However, the day that Green Cast ceased working on the project was the day that the general contractor terminated its contract with Green Cast, relieving it of its duties. *Id.* at 20, 554 *A.*2d 1350.

*Ribeira* can be distinguished from this case. In *Ribeira,* the court's refusal to look to the subcontractors' work was a recognition that regardless of the actions of its subcontractors, a contractor could not be said to be working on a project after its contract had been terminated and it has been dismissed from the work site. However, in this case, Olsen's contract was not terminated until September 11, 1990, and Eagle Fire filed this action on May 23, 1991, within the one-year window. Furthermore, Olsen subcon-

tractors were working on the project after May 23, 1990, giving Eagle Fire until a date subsequent to May 23, 1991, to file suit.

The uncontroverted evidence presented at trial indicated that Olsen was storing metal partitions and that Olsen's subcontractors were working under the contract as late as July or August of 1990, well past May 23, 1990. Therefore, a reasonable jury could not conclude that Eagle Fire's suit was untimely. The trial court erred both in its instruction to the jury and in answer to the jury's question when it responded that "the work done by subcontractors of Olsen and Hassold does not constitute work done by Olsen and Hassold themselves." It also erred in denying after the close of evidence Eagle Fire's motion for judgment as a matter of law. *See, e.g., Brill v. Guardian Life Ins. Co. of America*, 142 *N.J.* 520, 541, 666 *A.*2d 146 (1995) (holding that "[t]o send a case to trial, knowing that a rational jury can reach but one conclusion is indeed 'worthless' and will 'serve no useful purpose'"); *Ferdinand v. Agricultural Ins. Co.*, 22 *N.J.* 482, 493, 126 *A.*2d 323 (1956)(noting that issue should not be presented to jury when reasonable minds could not come to different conclusions regarding resolution). Furthermore, in *Brill, supra,* we "encourage[d] trial courts not to refrain from granting summary judgment when the proper circumstances present themselves." 142 *N.J.* at 541, 666 *A.*2d 146. This case presents the "proper circumstances."

Eagle Fire complied with the terms of the Labor and Material Bond and commenced suit against First Indemnity in a timely manner. Because there is uncontroverted evidence that Olsen continued to work on the project after May 23, 1990, Eagle Fire is entitled to recover under the bond the amount still owed it by Olsen for installation of the sprinkler system.

Because Eagle Fire filed suit within one year of the date that Olsen ceased work under the contract, we do not address whether the conduct of First Indemnity operated to equitably estop it from asserting the time bar defense. Similarly, we do not reach the issue whether the doctrine of *Peloso v. Hartford Fire Insurance Co.*, 56 *N.J.* 514, 521, 267 *A.*2d 498 (1970) should be extended to

surety agreements. *Peloso, supra,* held that the limitation period in a fire insurance policy, which stated that any legal action brought under the policy must be commenced within twelve months after the inception of the loss, was tolled from the time the insured gave the insurer notice of its claim until liability was formally declined.

## IV

 Finally, Eagle Fire is not entitled to attorney's fees. Pursuant to *R.* 4:42–9(a), "no fee for legal services shall be allowed in the taxed costs or otherwise except ... (6) In an action upon a liability or indemnity policy of insurance, in favor of a successful claimant." *R.* 4:42–9(a)(6). The question is then whether the obligation of a surety company under a labor and material payment bond constitutes "a liability or indemnity policy of insurance." The commentary following *R.* 4:42–9 provides that "since the stated intention of this rule was to permit an award of counsel fees only where an insurer refused to indemnify or defend in respect of its insured's third party liability to another, it *should not be extended, beyond its express terms,* to permit a counsel fee award to be made to an insured who brings direct suit against his insurer to enforce casualty or other direct coverage." Pressler, *Current N.J. Rules Court Rules,* Comment *R.* 4:42–9 (emphasis added).

The general rule is that parties to litigation should bear their own legal costs. *Coleman v. Fiore Bros.,* 113 *N.J.* 594, 596, 552 *A.*2d 141 (1989). In fact, "our court rules ... embrace[ ] the view that sound judicial administration will best be advanced by having each litigant bear his own counsel fee except in those few situations specifically designated." *Gerhardt v. Continental Ins. Cos.,* 48 *N.J.* 291, 301, 225 *A.*2d 328 (1966).

The express terms of Rule 4:42–9(a)(6) state that it "only applies when 'an insurer refuses to indemnify or defend its insured's third party liability to another' and does not authorize an award of counsel fees to an insured 'on a direct suit against the insurer to

enforce a casualty or other first-party direct coverage.'" *Giri v. Medical Inter–Insurance*, 251 *N.J.Super.* 148, 151, 597 *A.*2d 561 (App.Div.1991) (citations omitted). The *Giri* court observed that "the Supreme Court has twice rejected recommendations by the Civil Practice Committee to amend *R.* 4:42–9(a)(6) to allow awards of counsel fees in a broader range of suits brought by insureds against insurers." *Ibid.* The court concluded that the committee's rejection of any attempts to expand or broaden the rule "suggests that the rule should not be construed expansively to apply to disputes between insurers and insured which fall beyond its literal terms." *Id.* at 152, 597 *A.*2d 561. Furthermore, in *Fengya v. Fengya*, 156 *N.J.Super.* 340, 383 *A.*2d 1170 (App.Div.1978), where a mother brought suit pursuant to a guardian's bond in which a surety guaranteed a father's faithful protection of his daughter's money, the Appellate Division found that *R.* 4:42–9(a)(6) applies to the "ordinary situation where one buys insurance, to obtain protection against liability to third parties and to be indemnified when called upon to pay," and "the guardian's bond issued herein ... neither insures against liability nor agrees to indemnify an insured—rather, it agrees to pay any defalcations of the guardian...." *Id.* at 344–46, 383 *A.*2d 1170. The court, hence, concluded that the guardian's bond was not a liability or indemnity policy within the purview of *R.* 4:42–9(a)(6) and the trial court was without the power to award legal fees. *Id.* at 347, 383 *A.*2d 1170.

Similarly, in *Middletown Township v. Colen*, 164 *N.J.Super.* 193, 395 *A.*2d 928 (Law Div.1978), the court concluded that *R.* 4:42–9(a)(6) did not apply in an action brought against a surety company under a bond that guaranteed the successful completion of the construction of a private residence. The court observed that the rule "has been strictly construed so as to limit its application only to true liability and indemnity insurance policies." *Id.* at 196, 395 *A.*2d 928. The court held that surety contracts do not fall under the Rule's purview and denied the plaintiff's application for attorney's fees. *Ibid.*

The insurance contract in this case did not constitute a commitment by First Indemnity to pay Eagle Fire's liability to a third party or to indemnify Eagle Fire for such liability. Rather, the bond simply required First Indemnity to pay Eagle Fire for its work if Olsen did not do so. Because this is not a case where the insurer agreed to protect the insured from third-party claims, *R.* 4:42–9(a)(6) is inapposite. Accordingly, we hold that given the narrow scope of *R.* 4:42–9(a)(6), Eagle Fire is not entitled to legal fees.

## V

Eagle Fire commenced suit within one year of the date that Olsen ceased work under the contract. Complying with the terms of the surety bond, Eagle Fire is entitled to judgment against First Indemnity as a matter of law. Eagle Fire is not, however, entitled to an award of attorney fees and must bear its own litigation costs. We reverse the judgment of the Appellate Division and remand the matter to the Law Division for entry of judgment consistent with this opinion.

HANDLER, O'HERN, STEIN and COLEMAN, JJ., join in Justice GARIBALDI's opinion.

POLLOCK, J., filed a separate dissenting opinion.

WILENTZ, C.J., did not participate.

POLLOCK, J., dissenting.

The dispositive issue is whether plaintiff, Eagle Fire Insurance Company (Eagle Fire), instituted this action against defendant, First Indemnity of America Insurance Company (First Indemnity), within the one-year period required by First Indemnity's performance bond. First Indemnity furnished the bond to a general contractor, Olsen & Hassold, Inc. (Olsen), to guaranty Olsen's payment to subcontractors such as Eagle Fire.

The bond bars an action commenced one year after Olsen ceased work. I accept the premise that Olsen's responsibilities "included not only the furnishing of workers but also the supervision of the tradesmen and the storing of debris." *Eagle Fire v. First Indemnity Ins.,* 280 *N.J.Super.* 430, 438, 655 *A.*2d 939 (App.Div.1995). The jury found that Olsen ceased work before May 23, 1990. Over a year later, Eagle Fire commenced this action on May 23, 1991. A straightforward interpretation of the bond leads to the conclusion that the action is time-barred.

To circumvent the one-year period of limitations, Eagle Fire urges that work done by Olsen's contractors constitutes Olsen's work for the purpose of determining the time within which Eagle Fire may sue First Indemnity. Eagle Fire also asserts that the presence of trailers leased by Olsen after it otherwise ceased work likewise constitutes Olsen's work. The majority adopts both arguments. I respectfully dissent.

In its instructions to the jury the Law Division stated that " 'I further instruct you that the work done by subcontractors of Olsen & Hassold, does not constitute work by Olsen & Hassold themselves and therefore the presence or absence of such subcontractors at the site after May 23rd, 1990 is not relevant.' " *Id.* at 440, 655 *A.*2d 939 (quoting trial court's instructions to jury). The Appellate Division affirmed that instruction and directed entry of a judgment of no cause for action in favor of defendant. *Id.* at 444, 655 *A.*2d 939. I would affirm substantially for the reasons stated by the Appellate Division.

After a general contractor has itself stopped work, I would not impute to it the work of unsupervised subcontractors that remain on the job. "Any work a subcontractor performs after the original contractor's obligations have ended should not extend the surety's liability, since it is the conduct of the original contractor to which the bond relates." *W.F. Hayward v. Transamerica Ins.,* 16 *Cal.App.*4th 1101, 20 *Cal.Rptr.*2d 468, 471–72 (1993).

I likewise agree with the lower courts that after Olsen ceased work, the presence on the work site of trailers that Olsen had

rented is equally irrelevant. The date on which a lessor repossesses a general contractor's trailers from a work site should not determine the time to sue under that contractor's surety bond.

I dissent.

*For reversal and remandment*—Justices HANDLER, O'HERN, GARIBALDI, STEIN and COLEMAN—5.

*Dissenting*—Justice POLLOCK—1.