**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2938-21
                    A-2939-21

THAT'S AMORE RESTAURANT,
JACK AND DINO, LLC, and
HADDON AND COLLINGS, LLC,

     Plaintiffs-Appellants,

v.

TRAVELERS CASUALTY
INSURANCE COMPANY OF
AMERICA,[1]

     Defendant,

and

AMGUARD INSURANCE
COMPANY[2] and SERV PRO,

     Defendants-Respondents.

---

[1] Travelers Casualty Insurance Company of America was improperly pled as Travelers Insurance Company.

[2] AmGUARD Insurance Company was improperly pled as Berkshire Hathaway Guard Insurance Companies.

Submitted November 9, 2023 – Decided March 5, 2024

Before Judges Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-1313-19.

Buividas Law Group, attorneys for appellants (Stephen James Buividas, on the briefs).

Zirulnik, Demille & Vilacha, attorneys for respondent Serv Pro (Stephen G. Sobocinski, on the brief).

Finazzo Cossolini O'Leary Meola & Hager, LLC, attorneys for AmGUARD Insurance Company (Jeremiah Lynn O'Leary and Robert J. Pansulla, on the brief).

PER CURIAM

In these back-to-back appeals, plaintiffs appeal from the orders granting defendants SERVPRO and AmGUARD Insurance Company (AmGUARD) summary judgment. We affirm.

I.

Plaintiff Jack and Dino, LLC operated a restaurant named That's Amore, which rented space in a building owned by plaintiff Haddon and Collings, LLC. The LLCs are owned by Alfredo Fischioni.

Defendant Travelers Casualty Insurance Company of America (Travelers) insured Haddon and Collings, LLC. AmGUARD insured Jack and Dino, LLC.

Plaintiffs dismissed their claims against Travelers in April 2022. We glean from the record that Travelers paid Haddon and Collings, LLC monies for its loss of business income, repairs to the property, and for remediation work.

In their complaint, plaintiffs alleged That's Amore was damaged in December 2017 when a broken pipe blocked a vent in the restaurant's basement, causing the plumbing system to surpass its capacity and spill out through a "grease trap lid" and "air gap drains," "leaving raw sewage in duct work on wiring, on plumbing, and on kitchen and basement floors along with the entire joist system and interior of the restaurant, causing substantial damages."

Christina Colangelo was the manager of That's Amore at the time and testified during her deposition that she "basically [ran] the restaurant." Her duties included scheduling, payroll, paying the bills and taxes, serving, hosting, and catering events. She recalled the day of the incident being December 7, and although she was not present that day, she received a video from one of the employees showing the grease trap overflowing in the basement of the restaurant.

The next day, Colangelo went to work and called the municipality and "a couple different plumbers" about the grease trap; the plumbers advised her they

3

did not work on grease traps. She also hired several HVAC companies to try and resolve the issue.

According to notes made by Fischioni, on December 8, a company resealed the grease trap. However, within a short period of time there were several inches of water in the basement. When the same company returned, its representative advised Fischioni the problem was not "the [g]rease [t]rap but the discharge pipe was backing up." According to Fischioni, when the municipality official came to the restaurant, it "determined the water from the restaurant was not flushing out to the street."

On December 9, 2017, Colangelo contacted defendant SERVPRO of Cherry Hill to mitigate and remediate the damage. She testified that a "team of people" came to the restaurant to survey the area and damage. According to Colangelo, a representative from SERVPRO sat down with her and went through documents and discussed "everything" that "was going to take place." The service included mold containment, where SERVPRO would return to check on the mold levels. Colangelo could not recall whether Fischioni was present during the conversation.

Colangelo signed certain documents, including one entitled "Authorization to Perform Services and Direction of Payment" dated December

9, 2017. She testified she reviewed the front and back of the document and the signature on the document was hers. Above the signature line, the document stated in bold capital letters: "I HAVE READ THIS AUTHORIZATION TO PERFORM SERVICES AND DIRECTION OF PAYMENT, INCLUDING THE TERMS AND CONDITIONS OF SERVICE ON THE NEXT PAGE HEREOF, AND AGREE TO SAME. "

The relevant terms and conditions on the next page stated:

READ CAREFULLY

Note: This Contract Includes a limitation of liability and limitation of remedies.

. . . .

4. Limitation of Liability: IN NO EVENT SHALL PROVIDER . . . BE RESPONSIBLE FOR INDIRECT, SPECIAL, NOMINAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL LOSSES OR DAMAGES, OR FOR ANY PENALTIES, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY ASSERTED, INCLUDING CONTRACT, NEGLIGENCE, WARRANTY, STRICT LIABILITY, STATUTE OR OTHERWISE, EVEN IF IT HAD BEEN AWARE OF THE POSSIBILITY OF SUCH DAMAGES OR THEY ARE FORESEEABLE; OR FOR CLAIMS BY A THIRD PARTY. THE MAXIMUM AGGREGATE LIABILITY SHALL NOT EXCEED THREE TIMES THE AMOUNT PAID BY CUSTOMER FOR THE

5

SERVICES OR ACTUAL PROVEN DAMAGES, WHICHEVER IS LESS. IT IS EXPRESSLY AGREED THAT CUSTOMER'S REMEDY EXPRESSED HEREIN IS CUSTOMER'S EXCLUSIVE REMEDY. THE LIMITATIONS SET FORTH HEREIN SHALL APPLY EVEN IF ANY OTHER REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE.

. . . .

7. Any claim by Client for faulty performance, for nonperformance or breach under this Contract for damages shall be made in writing to Provider within sixty (60) days after completion of services. Failure to make such a written claim for any matter which could have been corrected by Provider shall be deemed a waiver by Client. NO ACTION, REGARDLESS OF FORM, RELATING TO THE SUBJECT MATTER OF THIS CONTRACT MAY BE BROUGHT MORE THAN ONE (1) YEAR AFTER THE CLAIMING PARTY KNEW OR SHOULD HAVE KNOWN OF THE CAUSE OF ACTION.

[(emphasis omitted).]

Colangelo stated she had full authorization from Fischioni to sign the documents and to issue a check for payment of the provided services. Colangelo also signed documents entitled "Customer Information Form Water Damage" and "Customer Disclosure and Consent."

At some point after SERVPRO completed its work, the state Health Department inspected the restaurant and cleared it to open for business.

6

However, Colangelo stated Fischioni closed the restaurant because of the "offensive" smell that "progressively got worse . . . every day."  In his deposition, Fischioni testified he was aware on Monday December 11 that "[he] needed further help, because [he] d[id]n't believe that what [SERVPRO] did was . . . sufficient.  Or something was still wrong."[3]

Therefore, Fischioni hired a public adjuster to assist in settling plaintiffs' claims.  Fischioni met with the public adjuster and a SERVPRO representative at the restaurant on December 13, 2017.  According to Fischioni, the public adjustor "confronted" the SERVPRO representative and "expressed substantial dissatisfaction with the efforts and results achieved by th[e] company."

On December 20, 2017, the public adjuster contacted Travelers indicating he was handling the claim for plaintiffs.  The adjuster advised Travelers that SERVPRO's actions had worsened the extent of the loss and he asked Travelers to withhold payment to SERVPRO.  Shortly thereafter, plaintiffs hired another remediation company to clean the premises.

In a certification presented in opposition to AmGUARD's motion for summary judgment, the public adjuster stated, "the cause of [plaintiffs'] loss was

---

[3] Plaintiffs only provided a portion of Fischioni's deposition transcript in their appendix.

A-2938-21

. . . an escape of sewer water" from "at least two locations within the sanitary plumbing system."  He said,

> A blockage formed near the vent location as a result of pipe joint breakage . . . where roots gained access . . . .
>
> . . . Consequently, the plumbing system was filled to its capacity to where any new water added would escape from the grease trap lid and from the air gap drains, soaking everything in that vicinity.

He further certified that SERVPRO's work "was not conducted properly" and raw sewage was left "in duct work, on wiring, on plumbing, and on the kitchen and basement floor along with a substantial amount of the joist system to include the interior basement walls."  In addition, "gallons of sewage [had] entered the duct work system" causing damage to the "two . . . hot water heaters, a boiler, and a furnace."

At the time of these events, plaintiffs were insured under a Businessowner's Policy of Insurance with AmGUARD.  Although plaintiffs initially submitted a claim under the policy, they later withdrew it on December 14, 2017.  After a second claim was submitted,[4] AmGUARD advised plaintiffs on September 8, 2018 that the claim resulted from "a back-up of water."

---

[4]  The second claim was made in March 2018.

A-2938-21

AmGUARD informed plaintiffs the loss was covered under the "Water Back-Up and Sump Overflow Endorsement" (the Endorsement) in the policy. The endorsement had a $5,000 limit of insurance for property damage. AmGUARD subsequently paid plaintiffs $5,000 under the Endorsement.[5]

AmGUARD's "Businessowner's Coverage Form" stated in pertinent part:

> SECTION I—PROPERTY
>
> A. Coverage
>
>> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
>>
>> . . . .
>>
>> 3. Covered Causes of Loss
>>
>> Risks of direct physical loss unless the loss is:
>>
>> a. Excluded in Paragraph B. Exclusions in Section I; or
>>
>> b. Limited in Paragraph 4. Limitations in Section I.
>>
>> . . . .
>
> B. Exclusions

---

[5] AmGUARD also informed plaintiffs the Endorsement included a $5,000 limit for business income loss. Plaintiffs did not supply the required documentation to support its claim for business income loss.

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

    . . . .

    g. Water

        . . . .

        (3) Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

            . . . .

        This exclusion applies regardless of whether any of the above, in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water. . . .

            . . . .

H. Property Definitions

    . . . .

10

12. "Specified causes of loss" means the following: Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

. . . .

c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

[(boldface omitted).]

The relevant provisions in AmGUARD's Endorsement state:

A. We will pay for direct physical loss or damage to Covered Property, covered under Section I—Property, caused by or resulting from:

1. Water or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain; or

2. Water or waterborne material which overflows or is otherwise discharged from a sump, sump pump or related equipment, even if the overflow or discharge results from mechanical breakdown of a sump pump or its related equipment.

. . . .

11

E. With respect to the coverage provided under this endorsement, the Water Exclusion in Section I—Property is replaced by the following exclusion:

Water

. . . .

3. Water under the ground surface pressing on, or flowing or seeping through:

   a. Foundations, walls, floors or paved surfaces;

   b. Basements, whether paved or not; or

   c. Doors, windows or other openings; or

4. Waterborne material carried or otherwise moved by any of the water referred to in Paragraph 1. or 3., or material carried or otherwise moved by mudslide or mudflow.

[(boldface omitted).]

In March 2019, plaintiffs filed a complaint against defendants alleging negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, promissory and equitable estoppel, unjust enrichment, common law legal and equitable fraud, and bad faith. Plaintiffs alleged SERVPRO did not properly perform the emergency mitigation service and remediation it was hired to do, "causing substantial damage[]." Plaintiffs alleged AmGUARD refused to pay for their lost revenue and profits, as well as other damages they incurred.

12

After the court dismissed multiple counts of the complaint, plaintiffs filed an amended complaint. In SERVPRO's answer to the amended complaint, it asserted numerous affirmative defenses, including that the action was barred by the statute of limitations. SERVPRO subsequently filed a motion for summary judgment. The court denied the motion, finding a genuine issue of material fact existed as to whether there was a valid contract between plaintiffs and SERVPRO.

In November 2020, SERVPRO filed a second motion for summary judgment. After oral argument, the motion judge granted SERVPRO's motion, finding the contract terms were set forth in bold print and in all capital letters, and there was no evidence that the terms could not be negotiated. The judge further found the contract contained a one-year limitation period within which to bring a claim.

The judge found the limitation clause was not unconscionable or invalid because it accorded plaintiffs a year to bring their claims, and plaintiffs were aware of deficiencies with SERVPRO's work within a year after the work was performed. The judge was satisfied that a contract existed because the evidence demonstrated Colangelo had the authority to sign the documents. Lastly, the court found that the contract was not one of adhesion because plaintiffs could

A-2938-21

have hired another company to perform the work. The court memorialized its oral decision in a December 18, 2020 order.

In August 2021, AmGUARD moved for summary judgment. In an oral decision, the court found the following undisputed facts: "the loss occurred due to a back-up of water into the basement"; a terra cotta sewer pipe was cracked and obstructed with roots; the pipe was located underground encased by earth; and, although there may have been some permeation of sewage at the area of the crack, the bulk of the sewer water reversed and went back into the building.

The court found that under the AmGUARD policy, there was no coverage for damage caused by the "back-up of a sewer or a drain" other than under the Endorsement for water back-up and AmGUARD had already paid the $5,000 property damage coverage limits. The court found the failure of the terra cotta pipe caused the sewer back-up, which was only covered under the Endorsement. The court memorialized its decision in a November 5, 2021 order.

## II.

On appeal, plaintiffs assert the court erred in granting summary judgment to SERVPRO because plaintiffs never agreed to be bound by the contract and its terms are unconscionable. In addition, plaintiffs contend the limitation and

14

liability clauses in the SERVPRO contract are unenforceable and not applicable to these circumstances.

As to their appellate arguments regarding AmGUARD, plaintiffs contend the court erred in its determination that the damages were caused by a water backup, and the claim was only covered under the Endorsement and not the policy's water exclusion. Plaintiffs also assert AmGUARD committed bad faith during the claim process.

Our review of the trial court's grant or denial "of a motion for summary judgment [is] de novo, applying the same standard used by the trial court." Samolyk v. Berthe, 251 N.J. 73, 78 (2022). We consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007), certif. denied, 195 N.J. 419 (2008), overruled in part by Wilson by Manzano v. Jersey

City, 209 N.J. 558, 563 (2012)).  We review issues of law de novo and accord no deference to the trial judge's conclusions on issues of law.  Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

## SERVPRO

Plaintiffs assert that the SERVPRO contract is unconscionable because it precluded "liability for most types of damage[s]," imposed a one-year limitation on the filing of a lawsuit, and stated these important terms on the back side of the document that did not require a signature.  Plaintiffs contend they were "at the mercy of SERVPRO" because they were facing an emergency with unequal bargaining power and no ability to negotiate, which is the classic situation of a contract of adhesion.

> [U]ndoubtedly, courts may refuse to enforce contracts, or discrete contract provisions, that are unconscionable. The unconscionability determination requires evaluation of both procedure and substance. Procedural unconscionability "'can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process.'"
>
> [Rodriguez v. Raymours Furniture Co., 225 N.J. 343, 366 (2016) (citation omitted) (quoting Muhammad v. Cnty. Bank of Rehoboth Beach, 189 N.J. 1, 15 (2006) (quoting Sitogum Holdings, Inc. v. Ropes, 352 N.J. Super. 555, 564 (Ch. Div. 2002))).]

16

Further, "[w]hen a contract is one of adhesion, the inquiry requires further analysis of unconscionability." Id. at 367. The four factors for evaluating the unconscionability of contracts of adhesion are: "[1] the subject matter of the contract, [2] the parties' relative bargaining positions, [3] the degree of economic compulsion motivating the 'adhering' party, and [4] the public interests affected by the contract." Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 356 (1992). "Those factors focus on procedural and substantive aspects of the contract 'to determine whether the contract is so oppressive, or inconsistent with the vindication of public policy, that it would be unconscionable to permit its enforcement.'" Rodriguez, 225 N.J. at 367 (quoting Delta Funding Corp. v. Harris, 189 N.J. 28, 40 (2006) (citations omitted)).

Plaintiffs have not established the contract was unconscionable. According to Colangelo and the documents in the record, the water backup had begun at least a week before she hired SERVPRO to remediate the damages. She had contacted several plumbers and HVAC companies attempting to resolve the issue. When SERVPRO came to the restaurant, the representative sat with Colangelo and outlined the proposed service and explained the documents to her. Colangelo also recalled reviewing both sides of the contract before signing it.

In evaluating the Rodriguez factors, plaintiffs were not per se unsophisticated customers. Colangelo had experience running the restaurant, which entailed reviewing and signing binding contracts. The terms at issue were not hidden in the contract nor are they overly complex or confusing. Although Colangelo described the situation as stressful, plaintiffs were under no compulsion to hire SERVPRO and sign the contract. They had contacted other service companies and could have continued to do so.

We also reject plaintiffs' contention that the one-year limitation for filing a lawsuit against SERVPRO was unconscionable. As our Supreme Court found in Eagle Fire Protection Corp. v. First Indemnity of America Insurance Co., 145 N.J. 345, 354 (1996), "[c]ontract provisions limiting the time parties may bring suit have been held to be enforceable, if reasonable." The Court declared it had "routinely upheld contract provisions that create a one-year time limitation in which claimants may bring suit." Id. at 355.

We discern no reason to conclude the one-year limitation was unreasonable. Furthermore, plaintiffs believed, as testified to by Fischioni, and were informed by the public adjuster, that SERVPRO's work was unsatisfactory within days after the work was completed in December 2017. But the lawsuit

was not filed until March 2019. We are satisfied the trial court did not err in granting SERVPRO summary judgment.

## AmGUARD

Plaintiffs contend the court erred in finding its damages were not covered under the AmGUARD policy because the damages were caused by a break in a pipe and that is a covered loss. Plaintiffs further assert the Endorsement provided coverage for the direct physical loss and damage they incurred. AmGUARD contends the court correctly found plaintiffs' damages were caused by a sewer-backup due to a break in the sewer pipe and the Endorsement applied to limit the coverage to $5,000 which AmGUARD paid.

"In a dispute over the interpretation of an insurance contract, it is the insured's burden 'to bring the claim within the basic terms of the policy.'" Rosario by Rosario v. Haywood, 351 N.J. Super. 521, 529-30 (App. Div. 2002) (quoting Reliance Ins. Co. v. Armstrong World Indus., Inc., 292 N.J. Super. 365, 377 (App. Div. 1996)). But "where the insurance carrier claims the matter in dispute falls within exclusionary provisions of the policy, it bears the burden of establishing that claim." Id. at 530. Insurance policy exclusions require strict construction and "a broad search 'for the probable common intent of the parties in an effort to find a reasonable meaning in keeping with the express general

19

purposes of the policies.'" Ibid. (quoting Royal Ins. Co. v. Rutgers Cas. Ins. Co., 271 N.J. Super. 409, 416 (App. Div. 1994)).

"Where the express language of the policy is clear and unambiguous, '"the court is bound to enforce the policy as it is written."'" Ibid. (quoting Royal Ins. Co., 271 N.J. Super. at 416). When a court is interpreting insurance policies, "the court should give the words of the insurance policy 'their plain, ordinary meaning.'" Sahli v. Woodbine Bd. of Educ., 193 N.J. 309, 321 (2008) (quoting Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001)). When no ambiguity is present, "courts '"should not write for the insured a better policy of insurance than the one purchased."'" Gibson v. Callaghan, 158 N.J. 662, 670 (1999) (quoting Longbordi v. Chubb Ins. Co. of N.J., 121 N.J. 530, 537 (1990)).

As the court found, the Endorsement is applicable to these circumstances. The Endorsement stated:

> A. We will pay for direct physical loss or damage to Covered Property, covered under Section I— Property, caused by or resulting from:
>
> 1. Water or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain . . . .

According to the public adjuster's certification, the restaurant had a built-in, standalone sanitary sewer/plumbing system, which was separate from its

storm drainage system. He stated that a pipe within the sanitary system broke and roots gained access, causing a blockage. As a result of the blockage, the sanitary system filled and escaped through the grease trap lid and air gap drains in the restaurant, "gallons of sewage . . . entered the duct work system[s]," and "[t]he furnace fan circulated [that] . . . sewage into the . . . building." In short, the sewer line which went into the restaurant's basement was impacted by tree roots that disrupted the flow of water in the pipe.

The damage to the restaurant was caused by a sewer back-up. The Endorsement applied to the loss. AmGUARD paid the coverage limits specified under the Endorsement. The trial court did not err in granting AMGUARD summary judgment.

In light of our determination that the order granting summary judgment was supported by the evidence in the record and the applicable principles of law, we need not address plaintiffs' contention that AmGUARD acted in bad faith. As our Supreme Court stated in Wadeer v. New Jersey Manufacturers Insurance Co., 220 N.J. 591, 604 (2015), "'[u]nder the "fairly debatable" standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an

insurer's bad faith refusal to pay the claim.'" (quoting <u>Pickett v. Lloyd's</u>, 131 N.J. 457, 473 (1993)).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2938-21